VANDECAR v. NOWLAND'S ESTATE.

1. WORK AND LABOR—CONTRACTS—COMPENSATION—EXPRESS CONTRACT.

   If the facts and circumstances attending the performance and acceptance of services rendered show an expectation of receiving compensation by the party rendering the service, and expectation to pay on the part of the one receiving them, a legal liability for the value of the services performed is created, and an express contract is not essential.

2. SAME—ESTATES OF DECEDENTS—CLAIM.

   In an action against an estate for services rendered de-

ceased by his son-in-law, evidence that decedent told claimant and his wife to go on a farm owned by him and work it, and what they' made was theirs, and the place would be for them, and that deceased at different times made assurances that the farm should be, or was, theirs, was insufficient to establish contractual relations between claimant and deceased, and said statements amounted only to declaration of testamentary intent, not binding on deceased or his estate.

3. SAME—SERVICES OF RELATIVE—PRESUMPTIONS.

Evidence examined, and *held*, that claimant has not, under the circumstances of this case, overcome the presumption that such services, rendered by a relative, are gratuitous.

4. SAME — ESTATES OF DECEDENTS — STALE CLAIM — EVIDENCE — DIRECTED VERDICT.

Where the items composing the claim extended through a period of nearly 30 years, and all were over six years old, and no demand for compensation was ever made during the lifetime of deceased, thus affording a presumption that none was contemplated by either party, particularly strong and convincing proof is required before leaving it to a jury.

Error to Wayne; Murphy, J. Submitted June 30, 1915. (Docket No. 76.) Decided September 29, 1915.

Matthew G. Vandecar presented a claim against the estate of Moses R. Nowland, deceased, for services and for money loaned to deceased. The claim was disallowed and claimant appealed to the circuit court. Judgment for defendant on a directed verdict. Claimant brings error. Affirmed.

*George M. Lehman,* for appellant.

*Condon, Nellis & Condon,* for appellee.

STEERE, J. This case involves a claim against the estate of Moses R. Nowland, who died September 2, 1905, leaving, as is indicated, real and personal property of substantial worth, though the amount and ap-

praised value of his estate is not disclosed in this
record. A widow and children, both by her and a
former wife, survived him. His son-in-law, M. G.
Vandecar, filed this claim against deceased's estate in
the Wayne county probate court. It consisted of items
for money loaned, proceeds of property sold, labor and
services of himself and team of various kinds, taxes
paid and improvements made on a farm owned by de-
ceased and occupied by claimant with his family for
many years. The items composing this claim extended
through a period of nearly 30 years, and amount to
$4,515.

Disallowance of the claim in the probate court was
affirmed on appeal to the circuit court, by judgment
on a directed verdict, upon the ground that claimant's
evidence failed to establish binding contractual rela-
tions between himself and deceased touching the items
of said claim, and that statements shown to have been
made by deceased expressing a purpose to give the
farm upon which claimant and his wife resided to
them amounted only to declaration of testamentary
intent, not binding on him or his estate.

Claimant's assignments of error necessarily relate
to the refusal of the court to give his requests to charge
and direction of a verdict against him, and present
but the one important question of whether his evi-
dence raised an issue for the jury as to a contract,
express or implied.

The scene of the events in evidence here is in and
around the village of New Boston, in the southwest
part of Wayne county, where deceased lived many
years of his somewhat protracted life, engaged in a
variety of business activities. His daughter Ella, who
was married to claimant in 1873, testifies that her
father "was in the law business, and had a sawmill,
and a store and charcoal kilns." He is also shown to
have owned at least five different farms. When claim-

ant married, he was "living around New Boston and working at different places, on the railroad at New Boston and Plymouth." Shortly after his marriage he went to work for his father-in-law in his sawmill, and also worked for him hauling logs, wood, coal, stone, etc. Soon after their marriage deceased gave claimant and his wife a small house and lot, called the "$250 place," which was sold, and the proceeds given to deceased to help build a house on a lot owned by claimant; the lumber and labor for this house being furnished by deceased. In 1878 or 1879 arrangements were made by which the second house and lot was sold for $500 and the proceeds turned over to deceased, claimant moving with his then family upon a farm owned by his father-in-law, located about one-half of a mile from New Boston, the latter then furnishing claimant and his wife a team of horses, harnesses and wagon, some hay, two cows, and various farm implements, they being given the use of the farm free of rent, except payment of taxes. Of this claimant's wife testifies:

"Before we went on the place we had a talk with my father. He told us to go down on the farm, and what we made was ours, and to go to work and work it, and the place would be for me and my husband, and he calculated for each of his daughters so much land.   *   *   *   There was no talk about our renting the land when we went there. We were to go on the farm and have the benefit of the crops, and we were to pay the taxes, and paid them, except one year."

Claimant and family remained upon this farm for 24 or 25 years, raising a family of 12 children. During the many years they made their home upon the place and enjoyed whatever it produced, claimant raised both crops and stock upon it and made improvements, of which he had the benefit while there. He cleared about 20 acres of land, built fences, a corncrib, pig pen, and other outbuildings, and planted an orchard while

upon the farm. He is also shown to have at times, mostly in the winter, worked for deceased with his team, hauling logs, wood, charcoal, stone, etc. The evidence as to these services is general in its tendencies, meager as to dates and values and destitute of any proof of express agreement as to any details. Claimant's wife says he worked for her father whenever he wanted him, and "my father never said anything of an account against my husband. My husband never kept an account against my father for the work he did."

This claim is urged upon the theory and under the general proposition of law that an express contract is not essential to substantiate it, but the facts and circumstances attending the performance and acceptance of the services rendered show an expectation of receiving compensation by the party rendering the service and expectation to pay on the part of the one receiving them, thus creating a legal liability for the value of the services performed. The only claimed proof of any expectation or promises in that connection relates to assurances by deceased that the farm should be, or was, theirs. It is conceded no deed or instrument in writing was given, and there is no proof of any agreement made at the time claimant and his family took possession of the place other than the statement of claimant's wife as to what her father then said to them. That it was supposed by neighbors and expected by claimant and his family that this farm would belong to claimant or his wife, or both, on the death of her father, is evident. That deceased frequently expressed such an intention during the years they were upon the farm is shown—sometimes that it was or would be his daughter's, and sometimes that both should have it. A neighbor named Davis, called by claimant, in the course of his testimony, said:

188 Mich.—28.

"I said on direct examination that it was his intention that Ella should have the 63 acres. * * * I have heard him say that Ella and Dick [claimant], also Dick and Ella. * * * I never heard him say he was giving it to him [claimant] for labor performed. * * * He talked repeatedly about the manner in which he was going to dispose of his property. * * * He would talk as he felt. * * * I heard him say to me, as well as others, what his intentions were about deeding away his property to his daughters and sons-in-law. I heard that a great many times."

Another witness named Burrows explained the nature of deceased's assurances as follows:

"Well, the place is Dick's. That is the way he used to call it: 'It is Dick's.' I presume likely he said at times, 'It is Ella's and Dick's,' but I could not say. * * * He never discussed with me the question of labor that Mr. Vandecar performed."

A witness named Nowland said:

"He changed his mind a number of times about certain pieces of property."

Claimant's wife and children and a cousin testify along the same lines, but more emphatic, as to hearing deceased at different times giving assurances that the farm belonged to one or both, that they had earned it, that it was going to be theirs, that he was going to give it to them and their children, that he "intended to give it to Ella," that "my father and mother was to work on the farm and us children, and when my grandfather and grandmother was dead it was to be my father's and mother's." Much other testimony of like import was introduced, a careful consideration of which constrains us to agree with the trial court that claimant has not, under the circumstances of this case, overcome the presumption that such services rendered by a member of deceased's family or a closely associated relative are gratuitous where no express contract is shown, nor against such presumption estab-

lished an implied contract, and that what is shown to have been said by deceased as to the disposition of this property goes no further than a declaration of testamentary intent.

It is well-settled law that:

"Particularly strong and convincing proof is required where the claim is stale, or where the services extended over a considerable period and no demand for compensation was ever made during the decedent's lifetime." 18 Cyc. p. 533.

Had the friendly relations and reasons for expectation in this case continued until deceased's death, this rule would be less applicable here, but in 1896 deceased's first wife, the mother of Mrs. Vandecar, died, and he subsequently remarried, having children by his second wife. He later sold a tract of ten acres from the farm in question, which led to some friction, resulting in litigation "in which he put them off the place," as stated by one of claimant's witnesses, and retook possession of the premises some six or seven years before he died. The details of this difficulty are not fully disclosed in the record, but it does appear that deceased's position in relation to his ownership of this farm was asserted and maintained by litigation over six years prior to his death and claimant put off the place, after which time he did no work for deceased. He now claims deceased was then owing him over $4,000. There is no evidence of any demand or assertion of this claim during decedent's lifetime. Some items of the claim were over a quarter of a century old, and all over six years, when the alleged debtor died. That no demand for compensation was ever made during his lifetime affords a presumption that none was contemplated by either party and is in itself at least strongly persuasive of laches.

This is of that class of claims in which it is held the duty of the court to require clear and substantial proof before leaving it to a jury to speculate as to the

existence of the contract necessary to support them. *Wright* v. *Senn Estate*, 85 Mich. 191 (48 N. W. 545); *Donovan* v. *Driscoll*, 116 Iowa, 339 (90 N. W. 60).

Our conclusion upon the whole record is that the trial court rightly directed a verdict for defendant.

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY, who sat in the case, took no part in this decision.