## KLEIMOLA v. KAUPPI.

PARENT AND CHILD—SERVICES RENDERED BY MOTHER-IN-LAW PRE-SUMED GRATUITOUS.

In an action by a mother-in-law against her son-in-law for services rendered while a member of his family, evidence that defendant sent a ticket to plaintiff to come from her home in Finland, that after her arrival she was told she could remain in the home as long as she cared to, that she stayed for over five years and rendered services, that defendant bought her clothes and gave her small sums of money from time to time, but that there was no contract of hiring, and defendant never expected to have to pay plaintiff for her services, *held*, insufficient to overcome the presumption that said services were rendered gratuitously.[1]

Error to Gogebic; Driscoll (George O.), J.   Submitted October 23, 1924.   (Docket No. 131.)   Decided December 10, 1924.

[1] Work and Labor, 40 Cyc. pp. 2821, 2849.

Assumpsit by Anna Kleimola against Otto Kauppi for services rendered.    Judgment for plaintiff.    Defendant brings error.    Reversed, and judgment ordered entered for defendant.

*Harry K. Bay,* for appellant.

*Edward W. Massie,* for appellee.

MOORE, J.    In 1915 the plaintiff was a widow 54 or 55 years old, living in Finland.    There was civil war in Finland at that time.    The wife of the defendant, who lived in Ironwood, Michigan, was the daughter of the plaintiff.    There was some correspondence between the plaintiff and some member of the Kauppi family which does not appear in the record. A ticket was sent Mrs. Kleimola, which paid her fare from Finland to Ironwood, where she arrived about Easter, 1916.    She at once became an inmate of the family of defendant, and did work therein for five years and some months.    While still an inmate of the family of Mr. Kauppi she got married.    Afterwards claiming that defendant owed her for work done, she brought this suit.    After her testimony was in and also after all of the testimony was in defendant moved for a directed verdict.    The trial judge was of the opinion that, while there was no express contract, the circumstances surrounding the case, taken in connection with the testimony, presented a question of fact for the jury as to whether an implied contract was shown, and overruled the motion.    The jury returned a verdict of $671.33 in favor of the plaintiff. A motion was made for a new trial which was overruled.    The case was brought here by a writ of error.

The defendant claims the case is controlled by a line of cases such as *Wright* v. *Senn's Estate,* 85 Mich. 191; *Harris* v. *Harris,* 106 Mich. 246; *Decker* v. *Kanous' Estate,* 129 Mich. 146; *In re Myron's Estate,*

165 Mich. 63; *Vandecar* v. *Nowland's Estate,* 188 Mich. 429.

On the part of the plaintiff it is claimed there was no error, citing *In re Young's Estate,* 39 Mich. 429; *Sammon* v. *Wood,* 107 Mich. 506; *Van Slambrook* v. *Little's Estate,* 127 Mich. 61; *In re Hoffman's Estate,* 200 Mich. 464; *In re Moon's Estate,* 219 Mich. 104; *In re Knox's Estate,* 220 Mich. 469.

The testimony of the plaintiff presents her side of the case as favorably as any part of the record, and we quote from it freely as follows:

"*Q.* You are the plaintiff in this case?

"*A.* Yes.

"*Q.* In the spring of 1916, Mrs. Kleimola, you came to this country. Tell the court and jury your purpose in coming here?

"*A.* A ticket was sent to me. * * *

"*Q.* Who sent you this ticket, Mrs. Kleimola?

"*A.* Mr. Kauppi. Mr. Kauppi, the defendant in this case sent me the ticket. There was no letter accompanying the ticket.

"*Q.* Wasn't there a letter on Mr. Kauppi's stationery that accompanied that ticket?

"*A.* No, it came before. * * *

"*Q.* And what was in that letter, Mrs. Kleimola; what did he say?

"*A.* I don't remember. The ticket says to come; that's all I remember.

"The destination of the ticket was from Finland to Ironwood and that was the home of Otto Kauppi. Otto Kauppi is married to my daughter. They have been married over ten years. They were married in this country.

"*Q.* When did you arrive in Ironwood? * * * Easter time of 1916?

"*A.* Yes.

"*Q.* You went to work in the home of the defendant as soon as you got here, Mrs. Kleimola?

"*A.* Yes, right away.

"*Q.* How many children did they have at that time?

"*A.* They had two, and then right after twins came.

"*Q.* How old were the two older children?

"*A.* One was 20 months and the other was 7 years old, I think.

"*Q.* What was the condition of Mrs. Kauppi's health when you arrived there?

"*A.* In poor condition.

"*Q.* What were your duties in the house there; what did you do?

"*A.* I took care of the children and I did all of the housework, and when the children came I took care of the children nights, too.  *  *  *

"*Q.* And you continued in the employ of the defendant from Easter of 1916 continually down to Thanksgiving day of 1921?

"*A.* Yes, 5 years and 8 months.

"*Q.* About a month after you started to work you went to them and asked for money; what did they tell you—to Mr. Kauppi?

"*A.* Sometimes he give me 50 cents, sometimes 25 cents, sometimes a dollar.

"*Q.* How many times did you ask him for money?

"*A.* I have asked him often but he hasn't given me all the time when I asked.

"*Q.* What did he tell you when he gave you 50 cents or 25 cents out of his pocket?

"*A.* He told me to ask the Mrs.

"*Q.* How much money did you get from the Mrs.?

"*A.* He told me to ask the Mrs.    She used to give me some, but I asked more from Kauppi.

"*Q.* During all the time that you worked there during the 5 years and 8 months that you were in the employ of the defendant, how much money did you get from him?

"*A.* I don't know.    I thought that they would pay me when I would go away.

"*Q.* You thought they would pay you when you left their employ?

"*A.* Yes.    The total that I got in small amounts might be $30, that's all, but then he gave me $20 when I left.

"*Q.* That made a total of about $50 that you received during the 5 years and 8 months that you were in his employ?

"*A.* Yes.    I did not have to buy my own shoes and clothing out of this $50 that I got.    They did not give

me additional money to buy some shoes and clothing. They went to buy it themselves.    *    *    *

"*Q*. How much do you think all this was worth, the shoes and the dress and the coat; what would you have to pay for the same articles if you purchased them yourself?

"*A*. It is about $60.

"*Q*. During the 5 years and 8 months that you were employed by the defendant that is all the compensation you received?

"*A*. Yes.

"*Q*. After you left there did you go to them and ask them for your money?

"*A*. Yes.

"*Q*. What did they tell you?

"*A*. He says yes, he will give it, but then he only gave me $20.

"*Q*. How much did you expect a month for your work in that household?    *    *    *    Thirty-five dollars a month?

"*A*. Yes.

"*Q*. That is what you told to Mrs. Kauppi in the spring of the year 1916, Mrs. Kleimola?

"*A*. No.    I thought they would pay when they started paying; I thought they would ask me then.

"*Q*. But you expected $35 a month?

"*A*. Yes.

"*Q*. During the 4 or 5 years that you were there, Mrs. Kleimola, did Mrs. Kauppi ever do much of the housework?

"*A*. No. She took care of the three rooms.    She cleaned up there.    I took care of the kitchen and bedroom and pantry.    She took care of the bedroom, the sitting room and the front room.    *    *    *

"*Q*. What is Mr. Kauppi's business, Mrs. Kleimola?

"*A*. Pop business.

"*Q*. Where does the Kauppi family live; is it in one of the buildings near the factory?

"*A*. In the same house where the pop shop is.

"*Q*. Upstairs?

"*A*. Yes.    *    *    *

"*Q*. And this $35 a month which you expected was for all the work you did in the way of ironing, cooking, caring for the children and other household duties?

"*A*. Yes.

"*Q.* And you think that is fair, a fair price?

"*A.* Yes.

"*Q.* Did you ever tell them that you expected to work for nothing?

"*A.* No."

Cross-examination:

"I will be 62 years old on December 22, I am the mother of five children.

"*Q.* When you left Finland, Mrs. Kleimola, wasn't there a civil war raging there?

"*A.* Yes.

"*Q.* And that had been going on for some time?

"*A.* Over a year.

"*Q.* And the people were in poor condition throughout Finland?

"*A.* Yes.

"*Q.* And they even ate bark bread?

"*A.* No, not yet.

"*Q.* They had eaten it before, hadn't they?

"*A.* No, after.   *   *   *   I stated that when the ticket came there was no letter, but before the ticket came I received a number of letters.   I do not remember how many letters I received before then.   I remember of one only.   The ticket came before and we had to wait quite a time to leave.   I do not remember how many letters I received between the time I got the ticket and the time I left.

"*Q.* Did any letters state that you were to go and work as a hired girl?

"*A.* No.

"*Q.* But on the contrary didn't the letters state that they were sorry for your condition on account of the civil war and famine?

"*A.* I wrote what kind of conditions there were, but I didn't ask for any help.

"*Q.* When you were at Kauppi's you never had to ask for clothing; they gave it to you voluntarily, didn't they?

"*A.* Yes; they saw when I needed that I got it.

"*Q.* And they took good care of you all the while didn't they?

"*A.* Yes, I had enough clothes.   *   *   *

"*Q.* Did Mr. Kauppi ever hire you as a servant in the house?

"*A*. No.    They never said anything about that when they wanted me.

"*Q*. Weren't you there all the time as a member of the family?

"*A*. Yes; and I took care of the children in the nighttime.

"*Q*. Did anybody compel you to work against your will?

"*A*. Yes, they made me because nobody else did it.

"*Q*. Did anybody tell you you must work?

"*A*. No, I knew what work was to be done and I did it.

"*Q*. Wasn't it your understanding that Mr. Kauppi was to take care of you as long as you lived as a member of the family?

"*A*. Yes; but I had to work night and day and I got tired and wasn't able to stay there.

"*Q*. Your answer to that question is 'yes,' however?

"*A*. Yes, yes.

"*Q*. You are sure about that?

"*A*. Yes, they always fixed me up.

"*Q*. You left because you were married to Mr. Kleimola?

"*A*. Yes.    The reason why I left was because I wasn't able to do the work during the night and day: I left immediately before or after I married Kleimola. I am living out on the farm with him now.    *   *   * I have reason to complain of Mr. Kauppi's treatment of me because he didn't give me any money and any better clothes.

"*Q*. As a matter of fact, you never asked him for wages or salary until you had left Kauppi's; isn't that true?

"*A*. I asked him for money and I thought he would pay me.

"*Q*. But he never paid you any money as wages or salary, did he?

"*A*. No, but he promised when he put the $20 on the table, and he walked away then.

"*Q*. That was after you were married to Kleimola, wasn't it?

"*A*. Yes, but I was in the house.

"*Q*. Up to that time it was the understanding that you were a member of the family?

"*A.* Yes, I stayed there.    None of my boys offered to provide a home for me.    And I have a couple of boys here.

"*Q.* Didn't Mrs. Kauppi say that at any time you were dissatisfied you could go and have a home with your sons?

"*A.* Yes, because I was tired working day and night; but where would I have gone?    I had no place to go. It was a strange place and I was unable to talk.

"*Q.* Didn't Mrs. Kauppi on a number of occasions when you were dissatisfied tell you to go and live with your sons if you didn't like it there, but that you could stay as long as you wanted to?

"*A.* Not often.

"*Q.* But she did say that?

"*A.* Yes.

"*Q.* No one compelled you to stay there?

"*A.* No.    Where would I have gone?    I had no money, and a strange place.

"*Q.* You never made any agreement with Mr. Kauppi that he was to hire you as a hired girl?

"*A.* No.

"*Q.* You are sure about that?

"*A.* Yes.

"*Q.* And you were a member of the family all the time?

"*A.* Yes.

"*Q.* And you are sure about that?

"*A.* Yes."

Redirect-examination:

"*Q.* Do you know what member of the family means, Mrs. Kleimola?

"*A.* It means you would be a member of the same family.

"*Q.* Related by way of relationship?

"*A.* Yes.

"*Q.* When you admit you were there as a member of the family, you say that because it is by way of relationship and not by way of your position in the household?

"*A.* Yes.

"*Q.* You say you were a member of the family because you are the mother of Mrs. Kauppi?

"*A.* Yes.

"*Q.* That is what you mean by saying you were a member of the family?

"*A.* Yes, but without wages.     I was without wages.

"*Q.* But you expected to be paid for your work?

"*A.* Yes.

"*Q.* Referring to the conditions in Finland, Mrs. Kleimola at the time you got these letters from Mr. Kauppi; what were you doing in Finland at that time?

"*A.* I was sewing.

"*Q.* Dressmaking?

"*A.* I sewed quite a bit and I did other work besides.

"*Q.* Making a pretty good living?

"*A.* Yes.

"*Q.* Were you eating bark bread?

"*A.* No.

"*Q.* Plenty of food?

"*A.* Yes, I have three children in this country. They all live in Ironwood.     The oldest one is twenty-five years, I think.     Mrs. Kauppi is the only one that is married.     The two boys aren't married.

"*Q.* The $20 that you speak of which Mr. Kauppi gave you when you left his employ, was this the day you left, Mrs. Kleimola, or afterwards?

"*A.* The same evening when I left.

"*Q.* Were you married then or afterwards?

"*A.* Yes, I was married but I was staying at Kauppi's.

"*Q.* Was it your hard work and your difficulties at the Kauppi's which prompted you to marry again, Mrs. Kleimola?

"*A.* Yes."

Recross-examination:

"None of my sons have contributed to my support while I was at Kauppi's.

"*Q.* You understood all the time that Kauppi would take care of you as long as you lived?

"*A.* No.     I saw that I wasn't able to stay there, so I went away.

"*Q.* Wasn't it your understanding that Mr. Kauppi was to take care of you as long as you lived if you wanted to stay there?

"*A.* They said that, but I couldn't stay there."

Mr. and Mrs. Kauppi were both sworn as witnesses

and testified in substance that they sent for the plaintiff because of the conditions in Finland, and that when she arrived at their house she was told that she could remain as long as she wanted to do so, and that from time to time small sums of money were given to her as she asked for it, and that they also furnished her with articles of clothing from time to time, and that they never expected to pay her wages for her services.    The evidence discloses that Mr. Kauppi is a man in moderate circumstances and has never employed a maid in his house except temporarily when Mrs. Kauppi was ill.

Chief Justice MONTGOMERY, speaking for the court in *Decker* v. *Kanous' Estate*, 129 Mich. 146, said:

"While the rule in this State does not require that there shall be an express contract in terms, it does require that there shall be at least an implied contract, and that there shall be enough in the record to overcome the presumption arising from the family relation. See *Mason* v. *Dunbar*, 43 Mich. 407 (38 Am. Rep. 201) ; *Wright* v. *Senn's Estate*, 85 Mich. 197; *Boughton* v. *Boughton's Estate*, 111 Mich. 26; *Harris* v. *Harris*, 106 Mich. 246; *Van Fleet* v. *Van Fleet*, 50 Mich. 1; *Van Slambrook* v. *Little's Estate*, 127 Mich. 61."

We do not understand this court has ever announced any rule to the contrary.    When this rule of law is applied to this record as disclosed by the testimony of the plaintiff, we do not think it can be said that she has shown that defendant expected to pay her in any other way than she was paid.

The trial judge should have directed a verdict as requested.

The judgment is reversed and the cause remanded with directions to enter a judgment in favor of defendant, with costs to the appellant.

CLARK, C. J., and McDONALD, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.