COLONIAL THEATRICAL ENTERPRISES *v.* SAGE.

1. VENDOR AND PURCHASER—OPTIONS.

That option to purchase lease of real estate was complete, effective, and as agreed upon when executed, *held*, established by preponderance of testimony.

2. SAME—BONA FIDE PURCHASER—OPTIONS—SPECIFIC PERFORMANCE.

In suit for specific performance of option to purchase lease of real estate, evidence *held*, to establish that plaintiff was *bona fide* purchaser under recording laws (3 Comp. Laws 1929, § 13304).

3. SAME—ESTOPPEL—NOTICE.

All that is required of party who is put on inquiry is good faith and reasonable care in following up inquiry which notice to him suggests, but inquiry in such case must be made at reliable source, from which true state of facts will naturally be disclosed.

4. SAME—DILIGENCE OF PURCHASER.

Where owner of lease stated to prospective purchaser that he was not owner and asserted title in record holder, purchaser could rely thereon and was not required to demand proof of lack of title in owner.

5. ESTOPPEL—APPLICABLE TO REAL ESTATE.

Doctrine of estoppel is applicable to real estate to estop owner from asserting title where he has represented to purchaser or

mortgagee that title is in another; estoppel being stronger where owner actively participated in deal.

6. SAME—FRAUDS, STATUTE OF.
Although, under statute of frauds (3 Comp. Laws 1929, § 13411) interest in land cannot be created or granted except in writing, owner may, by reason of his own conduct in asserting title in another, be estopped from proving his own title.

7. SAME—FRAUD—RELIEF.
Basis of estoppel is fraud, and, being equitable, is dependent upon circumstances, and relief granted accordingly.

8. SAME—SPECIFIC PERFORMANCE.
In suit for specific performance of option to purchase lease of real estate, plaintiff *held*, entitled to decree as against assignees of owner who actively participated in deal, asserting title to be in record holder.

9. SPECIFIC PERFORMANCE—REMEDY OF GRACE.
Specific performance is remedy of grace and should not be granted in absence of assurance that contract will be performed by plaintiff.

Appeal from Wayne; Moll (Lester S.), J. Submitted June 3, 1931. (Docket No. 46, Calendar No. 35,746.) Decided June 25, 1931. Rehearing denied September 8, 1931.

Bill by Colonial Theatrical Enterprises, a Michigan corporation, against Albert A. Sage and others for specific performance of an option to purchase a lease of real estate. Cross-bill by defendants Cohen against plaintiff and another for quiet enjoyment and other relief. From decree for return of deposit, plaintiff appeals. Reversed, and specific performance granted.

*Wm. Henry Gallagher, Shapero & Shapero,* and *Lodge & Brown,* for plaintiff.

*Lightner, Oxtoby, Hanley, Crawford & Dodd,* for defendants Sage, Frank Farrington, Estate of

Frank Farrington, deceased, and Union Trust Company.

*Finkelston, Lovejoy & Kaplan (Henry Glicman,* of counsel), for defendants Cohen.

*Patterson & Patterson,* for defendants Evelyn and Jean Farrington.

FEAD, J. This is a bill for specific performance of an option to purchase a lease of the Colonial Theatre property in Detroit. Plaintiff is a $2,000 corporation, organized by Jacob Schreiber, his wife, and business manager to take over the option.

In 1915, the fee owner, Thomas Hunter, now deceased, gave Clare and Graham Hoffman a 30-year lease, with ground rental (for the 10-year period beginning 1925) of $18,000 per year, with taxes and other charges.

Frank Farrington, who died after this suit was commenced, was a building contractor, constructed many theatres, and was an experienced business man. In 1911, Albert A. Sage entered his employ, later became manager of his construction jobs, had his confidence, and continued to transact business for him to the time of his death.

Farrington constructed the Colonial Theatre for the Hoffmans. Trouble arose, and, on December 6, 1917, he took over the Hoffman lease, but caused the assignment of it to run to Sage because of complications and litigation arising out of the construction. The lease and assignment were recorded December 7, 1917, and attached together. March 19, 1918, Sage executed an assignment of the lease to Farrington. This assignment has never been recorded and it does not appear that notice of it was given Hunter. It seems to have been something of a migratory paper, as its condition and the testimony

persuasively indicates that, while it originally was attached to the lease and Sage assignment, it since has been removed and reattached. Evidently it was not intended to be so unequivocally established as a conveyance to Farrington as to put it beyond the possibility of such use in showing title in him or in Sage as future exigencies should require.

July 18, 1918, Sage executed to Herman Warren and Ben Cohen a sublease, describing Sage as the holder of the Hoffman lease, for the period ending November 30, 1930, at progressive rentals, the rate for the last five years being $26,000, with the option of a 15-year renewal at the same rate until 1935, and $28,000 annually for the balance of the term, the option to be exercised by notice to be given one year before expiration of the original term. Farrington, in writing, ratified the sublease and declared it binding on any legal or equitable interest he had or may have in the premises.

Later, Warren's interest was taken over by the Cohens. They operated the theatre successfully until 1927, and at a loss thereafter. On September 10, 1929, they notified Sage, Farrington, and Hunter that they would not renew the sublease. They also attempted to dispose of the unexpired term, at first by sale, then by gift, then by offering a bonus, but were unsuccessful.

The Cohens claim they had no intention of surrendering the property, but, at suggestion of Schreiber, decided they were paying too much rent and engaged upon a plan to mismanage the theatre and to show a loss in order to secure a reduction of rent on renewal of the lease. The evidence does not sustain the claim, but, on the contrary, preponderates that they were anxious to get rid of the theatre until later developments caused a change of mind.

In November, 1929, Schreiber, a friend of the Cohens, with their acquiescence, took charge of the Fine Arts Theatre in the same neighborhood. He adopted the policy of running the theatre all night, and it proved successful. About Christmas, 1929, the Cohens tried the same plan, and their theatre soon began to pay expenses. They had made no effort to obtain a new lease within the option period, but because of the success of the new policy of operation a desire to have a further lease arose.

On receiving the notice from the Cohens, Farrington became worried about the theatre on account of the ground rent and charges, and enlisted the aid of architects, attorneys, and real estate men to dispose of the lease. One of the architects interested Schreiber, who, through a real estate broker, Savage, opened negotiations with Sage and Farrington.

On January 14, 1930, terms of an option to Schreiber were virtually agreed upon. An appointment was made to meet in the office of Schreiber's attorney, Mr. Shapero. On January 15th Farrington, Sage, Schreiber, Savage, and Shapero met at the office of Shapero, and, after discussion, an option was dictated by Shapero to his stenographer. Shapero started to dictate it as running from Farrington to Schreiber, but Farrington stopped him, informed him that the option should run from Sage to Schreiber, as Sage was the owner of the lease. Farrington also stated that he was having trouble with his wife, and that, because of his marital difficulties, he would not appear in the deal at all. The original lease with assignment to Sage was given to Shapero to examine. The assignment from Sage to Farrington was not attached to it at the time nor was it produced, nor was Shapero or Schreiber informed that Farrington had a formal assignment

from Sage or any other instrument vesting legal title in him. Shapero examined the record title the next morning.

On January 16th, Farrington, Sage, and Shapero and Schreiber met in Shapero's office. The option was read by all of them, was executed by Sage, and Schreiber gave Sage his check for $1,500 at Farrington's direction. The instrument provides two options; the first for an assignment of the lease for $23,500 in cash, to be exercised not later than March 15th, 1930; and the other, to be exercised not later than June 15th, for assignment on payment of $10,000 in cash and $18,500 in four equal yearly installments, to be evidenced by promissory notes. In the option, Sage specifically represents that he is the owner of the Hoffman lease and also of the Cohen sublease.

Sage arranged for approval of the option by the Hunter estate, and it was given January 27th by way of notice from the attorney for the estate that formal approval was not necessary. On January 28th, Sage again went to Shapero's office, formally acknowledged the option, and it was recorded January 29th. On February 3d Sage sent $1,000 of the money to Farrington, who knew the option had been signed and delivered, and the money represented the consideration therefor.

It is defendants' claim that the option was to have been approved by Farrington before it became effective, that it was not drafted in accordance with the agreement, as it did not provide that the notes should be indorsed or secured, and that Farrington disapproved the option for that reason.

Before his death, Farrington filed an answer to the bill of complaint and made no such claim. The next day after the option was executed, Sage sent

Farrington his copy. No complaint of terms of the option was ever made to Schreiber by Farrington or Sage until Schreiber undertook to exercise it, although, after it was given, Schreiber negotiated with Farrington in an effort to trade an apartment house on the deal for assignment of the lease. Neither Sage nor Farrington attempted to return the $1,500 payment. The first offer to return was tender made by the estate after Farrington's death. If the option had not expressed the agreement of the parties, or if Farrington had disapproved it, it would seem that objection would have been made to Schreiber; and it is certain that Sage would not have gone back to Shapero's office 12 days after its execution and acknowledged it. The testimony preponderates that the option was complete, effective, and as agreed upon when executed by Sage.

Later, the Cohens having found that their theatre was profitable on the all-night basis, began negotiations for a new lease, although they knew of Schreiber's option. Their attorney advised them that the option was invalid. On March 29, 1930, they executed to Sage an agreement to defend any litigation arising out of the Schreiber option and to save him harmless from damages therefrom. April 2d, Farrington executed to Ben and Lou Cohen a 15-year lease of the premises at the rental of $26,000 per year for five years, and $28,000 annually for the balance of the term. This lease was guaranteed by Abe Cohen. Sage signed a ratification of the lease declaring it binding upon any legal or equitable interest he had or might have.

Schreiber organized the plaintiff corporation, assigned his interest in the option to it on May 6th, and, on the same day, exercised the option by tendering Sage $10,000 in cash and demanding an assign-

ment. On complaint that the delayed installments were not secured, Schreiber offered to pay the whole cash price. Performance being refused, this bill was filed May 21st against Sage for specific performance of the option. Later, because of disclosures in Sage's answer, amended bills were filed, and Farrington and the Cohens were made parties.

Plaintiff had decree for return of the $1,500 paid on the option, but no other relief.

The case presents two major questions: First, was Schreiber a *bona fide* purchaser under the recording laws? Second, was Farrington estopped to claim title to the lease? 3 Comp. Laws 1929, § 13304, provides:

"Every conveyance of real estate within the State hereafter made, which shall not be recorded as provided in this chapter, shall be void as against any subsequent purchaser in good faith and for a valuable consideration, of the same real estate or any portion thereof, whose conveyance shall be first duly recorded."

Sage was record owner of the lease. Schreiber was a purchaser for valuable consideration, and his option was recorded. Farrington's assignment was not recorded. The conditions of the statute were fulfilled if Schreiber took in good faith. He had no actual notice of Farrington's assignment. He had sufficient information that Farrington had an interest to put him on inquiry, but was not bound at his peril to ascertain the true condition of the title.

"All that is required of a party who is put upon inquiry is good faith and reasonable care in following up the inquiry which the notice given him suggests. If due and diligent inquiry is made and notwithstanding it no knowledge of the outstanding

equity is acquired, the purchaser will have performed his full duty and will not be charged with further notice. But the inquiry in such a case must be made at a reliable source from which the true state of facts will be naturally disclosed." 27 R. C. L. p. 712.

See, also, *Barnard* v. *Campau*, 29 Mich. 162, 164; *Schweiss* v. *Woodruff*, 73 Mich. 473.

In *Converse* v. *Blumrich*, 14 Mich. 109 (90 Am. Dec. 230), defendant, put upon inquiry as to plaintiff's interest, applied to him for information, and plaintiff denied knowledge of the contracts or obligation thereunder. The court said, at page 121:

"As between himself and Converse, Blumrich had fully discharged his duty by making the inquiry; and the former will not be heard to claim that Blumrich should have received and acted upon the prior information, instead of the positive statements made by himself to the contrary. When one seeks the best authority to ascertain the truth of rumors, and is there misled, the person misleading him can hardly be allowed to support rights by insisting that he should still be chargeable with the reports which he had endeavored in vain to verify. The law of constructive notice can never be so applied as to relieve a party from responsibility for actual misstatements and frauds."

While Schreiber and Shapero originally assumed that Farrington was the owner of the lease, there was no showing that they knew the true condition of the title or the existence of the assignment to Farrington. When Farrington asserted to them that the option should run from Sage because he was the owner, gave Shapero the muniments of title showing ownership· in Sage, permitted execution of the option containing representations that Sage was the owner of the lease, approved the payment

of consideration to Sage as owner, and failed to disclose the unrecorded assignment to himself, he relieved Schreiber of the duty of further inquiry as to his interest. His conduct amounted to representations that his interest was not such as would prevent Sage conveying full legal and equitable title, and constituted fraud upon Schreiber if the assignment was a valid conveyance. From all the testimony, including Sage's, Schreiber and Shapero could still have believed that Farrington had an interest in the lease in the respect that title to it had been taken and held in Sage in fraud of Farrington's creditors and his wife's marital rights. But in the absence of disclosure of written evidence of title and in the face of Farrington's positive assertions, continued belief in such unenforceable interest would not charge Schreiber with the duty of further inquiry nor indicate that he did not take in good faith. He was not required to demand that Farrington prove a lack of title in himself.

We think the recording statute applicable to the situation and that plaintiff's option is superior to Farrington's assignment.

But decision need not rest wholly on the recording laws. The doctrine of estoppel applies to real estate.

"It has been held in many cases that if the owner of land knowingly stands by and permits his property to be mortgaged or sold by another, to one who is to the owner's knowledge relying on the apparent ownership of the person executing the conveyance, such conduct will estop the owner from asserting his title against the mortgagee or grantee." *Craig v. Crossman,* 209 Mich. 462, 480.

See, also, *Johnson* v. *Becker,* 251 Mich. 132; 10 R. C. L. p. 781; 21 C. J. p. 1166; 50 A. L. R. 671, note.

The estoppel is even stronger if the party estopped has represented that the title is in another and has actively participated in the deal. *Beatty* v. *Sweeney,* 26 Mich. 217.

Defendants, however, contend that the doctrine of estoppel does not apply because an interest in lands cannot be created or granted except in writing, under the statute of frauds. 3 Comp. Laws 1929, § 13411.

We seem to have no decision precisely identical on the facts, but the relevant principle is well established. In *Gugins* vi *Van Gorder,* 10 Mich. 523 (82 Am. Dec. 55), and *First National Bank* v. *McAllister,* 46 Mich. 397, the person estopped had legal title. He had destroyed his deed and directed a new conveyance from his grantor to another. This did not divest him of title, but it was held he was estopped from proving his own title. It is true that in these cases the attempt to prove title was by parol, but the holdings go beyond a technical rule of evidence (*Stevens* v. *DeBar,* 229 Mich. 251), and were put upon an equitable basis. In *First National Bank* v. *McAllister, supra,* the court said:

"Mrs. McAllister holds the legal title of record. The presumptions in her favor cannot be destroyed without proof of an earlier right which is based on superior equities, because the first deed recorded is presumptively the best. There would be no equity whatever in allowing a party who has been the procuring agent in giving her this legal priority to destroy it in his own favor, by showing by parol evidence that he once had an unrecorded deed from the same grantor."

The same reasoning and equitable considerations which would estop a grantee from giving parol evidence of a destroyed unrecorded deed to himself

would estop a grantee from producing a deed which he had fraudulently concealed from the person to whom he had given priority of record.

In *Stevens* v. *DeBar, supra,* with review of the authorities, it was said:

"This court has consistently held that title to real estate may not be created by estoppel, but in numerous cases this court has also held that a party may estop himself after the arrangements have been fully executed from asserting that the title he by his own acts has created or aided in creating is not the true title."

See, also, 50 A. L. R. 685.

In practical effect, estoppel of Farrington does not create title in plaintiff by parol. It merely eliminates from consideration Farrington's assignment and permits title to run by written instrument from Sage to plaintiff.

Defendants contend that, as Schreiber could be restored to *status quo* by repayment to him of the $1,500 advanced by him, no estoppel arises because estoppels are limited to making a person whole and cannot be made an instrument of gain or profit, *Lindsay* v. *Cooper,* 94 Ala. 170 (11 South. 325, 16 L. R. A. 813, 33 Am. St. Rep. 105), cited also in *Green* v. *Stevenson* (Tenn. Ch. App.), 54 S. W. 1011, but recognizing that its doctrine is not generally accepted by the courts. In addition to the advance, Farrington's acts have led plaintiff to the expense of litigation against Sage (*Meister* v. *Birney,* 24 Mich. 435), and if Farrington is now permitted to claim title, plaintiff will lose the benefit of the option. The basis of estoppel is fraud. The doctrine, being equitable, is dependent upon the circumstances, and the relief ranges from mere reimbursement to putting the party entitled to its benefit in

the same position as if the thing represented was true. *Baker* v. *Wood,* 157 U. S. 212 (15 Sup. Ct. 577); *Grissler* v. *Powers,* 81 N. Y. 57 (37 Am. Rep. 475).

Specific performance is a remedy of grace and should not be granted in favor of a party in the absence of assurance that the contract will be performed by him. The objection that plaintiff's financial standing renders insecure the deferred payments has been met by plaintiff's counsel on the argument to pay the consideration in cash.

The decree will be reversed, and one entered in this court remanding the cause to the circuit court, with directions to enter a decree for specific performance, on plaintiff, within 30 days after ascertainment of the amount, depositing with the clerk of the court the sum of $28,500, less proper credits for rents under the Cohen lease or otherwise, as the court shall determine on hearing. Plaintiff will have costs against all defendants.

The record contained 1,026 pages. The hearing in circuit court began February 2, 1931. The briefs were filed in ample time before the June term of court and contain exhaustive abstract and counter-abstract of the testimony. We feel that such diligence of counsel is worthy of special mention.

BUTZEL, C. J., and WIEST, CLARK, McDONALD, POTTER, SHARPE, and NORTH, JJ., concurred.