JOSEPH ROLL ET AL., APPELLEES, V. LEWIS MARTIN ET AL., APPELLANTS.

82 N. W. 2d 34

Filed March 29, 1957. No. 34064.

*Bernard M. Spencer,* for appellants.

*Edwin Moran,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Otoe County of an action wherein the trial court held the defendants, Lewis Martin and Chiona Martin, husband and wife, had, by their words, acts, statements, representations, and conduct, forever estopped themselves from denying the title of plaintiffs, Joseph Roll, Edward Roll, and Carl Roll, in and to certain lands described in the decree and permanently enjoined the defendants from in any manner interfering with the plaintiffs' use and occupancy thereof. After the foregoing decree had been rendered defendants filed a motion for new trial and this appeal is from the overruling thereof.

Appellees, in their amended petition on which the case was tried, claimed to own the lands herein involved by adverse possession and prayed that the title thereto be quieted and confirmed in them as the owners in fee simple by reason thereof. At the conclusion of their evidence, but before they rested their case, appellees asked leave of, were granted permission to, and did withdraw this issue. However, in their amended petition the appellees properly set forth the claim upon which the trial court granted the relief that it did, which appellees had prayed for.

Since this is an equitable action it will be reviewed here de novo. In view of the record, which discloses that the trial court viewed the premises, we think the following principles have particular application:

" 'While the law requires this court, in determining an appeal in an equity action involving questions of fact, to reach an independent conclusion without reference to the findings of the district court, this court will, in determining the weight of the evidence, where there is an irreconcilable conflict therein on a material issue, consider the fact that the trial court observed the witnesses and their manner of testifying.' Gentry v. Burge, 129 Neb. 493, 261 N. W. 854." Higgins v. Adelson, 131 Neb. 820, 270 N. W. 502.

"This court has held that, when the court views the topography of a certain locality, its findings are entitled to great weight." Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647.

The evidence is in irreconcilable conflict on material matters. We have come to the conclusion that appellees' version of what happened is correct and will set forth the facts accordingly as it would serve no useful purpose to set out appellants' evidence that is in conflict therewith.

The lands herein involved are described by metes and bounds. We shall not set forth the rather lengthy description thereof but only state that they lie between the Chicago, Burlington and Quincy Railroad Company's right-of-way and what was Frazer's Island and are in Sections 14 and 15, Township 8 North, Range 14 East of the 6th P.M., in Otoe County, Nebraska.

Frazer's Island, also referred to in the record as Frazier's Island, was located in the Missouri River, near the Nebraska side, just below Nebraska City. In 1936 the United States government closed a channel of the Missouri River that was then flowing between the island and the Nebraska mainland. It did this by means of constructing an earthen dike across the channel. This caused the channel that was closed to fill with silt and some years thereafter the island became attached to the mainland.

The Martin family had lived on the island for many years. Their occupancy included three generations: Appellants, their children, and his parents. Sometime after the earthen dike was put in appellant Lewis Martin, whom we shall hereinafter refer to as Martin, built a fence along the west and north side of the land appellants were then occupying on the island. The fence built on the north side ran generally east and west along a wooden pile dike. It extended east to the Missouri River. The fences constructed on the west side ran generally north and south some distance east of the

channel that was closed. At the south end this north-south fence was 1,038 feet east of the center line of the railroad right-of-way and at the north end it was 608 feet east thereof. At the latter point it connected with the west end of the east-west fence along the wooden pile dike. The land here involved lies generally west and north of these two fences and they are the fences hereinafter referred to.

John McCarthy, who died on February 13, 1946, at the time of his death owned the record title to whatever land there was in Sections 14 and 15 which lay east of the railroad right-of-way and west of the Missouri River, which right-of-way was located on the Nebraska mainland and ran along the west bank of the channel that was closed in 1936. Just how much land there was between the right-of-way and the river, prior to 1936, is not shown although there was apparently some.

In the latter part of May or the first part of June 1946, while the estate of decedent John McCarthy was being administered by the county court of Otoe County, Vantine A. James, attorney for the estate, Otto H. Wellensiek, and T. Simpson Morton went to see Martin. They went to find out from him just what land decedent owned and the boundaries thereof as they related to appellants' land as James and Wellensiek were both interested in buying the land and James also wanted the information for the benefit of the heirs of the decedent. They found Martin at home and told him the reason for their coming. Martin then showed them the north-south and east-west fences he had built, walking along the north-south fence from the earthen dike north to the wooden piling dike and then east along it to the river. While doing so he told them he owned nothing west or north thereof, as that land belonged to either Woolsey or McCarthy, and that he only claimed to own the land that lay to the east and south thereof. James, relying on these statements of Martin, purchased from the heirs of decedent John McCarthy all their interests

in these lands. He paid a valuable consideration therefor. The deed of conveyance is dated April 5, 1947.

In 1948 James offered to sell these lands to appellees. Before buying this land appellees Joseph and Edward Roll made inquiries of Martin concerning it because they wanted to find out for sure what claims, if any, Martin was making thereto and what he considered the boundary lines to be. Martin told them, as he had the others in 1946, that he did not claim anything west of the north-south fence and nothing north of the east-west fence constructed along the wooden pile dike. Relying on these statements appellees, for a valuable consideration, purchased the interests of James in the lands, the deed being dated January 27, 1949.

In 1949 and 1950 appellees did considerable work on the land by breaking down the willows and other vegetation growing thereon. They did this with two bulldozers. In the summer of 1953 appellees sprayed the land by means of a plane. Some of the poisonous spray used apparently blew over onto a melon patch which Martin had east of the north-south fence and damaged it for Martin sued appellees in the county court of Otoe County on that basis. During the course of the trial Martin admitted appellees owned the land west of the north-south fence. In the fall of 1954 the appellees began clearing the area they had sprayed in 1953. They cleared some 12 to 15 acres. It was while they were doing this clearing that Martin first objected to their taking possession of the land. Martin then constructed a one-wire fence almost over to the railroad right-of-way thus, for all practical purposes, excluding appellees from the lands herein involved. This suit followed.

We find that neither Martin nor his father, Manley Martin, ever made any claim to any of the lands herein involved, until Martin did so in the fall of 1954, and that neither Martin nor his father did anything that resulted in their obtaining any rights thereto by adverse possession. In fact, it appears the first time any of the Mar-

tins attempted to take possession thereof was in the fall of 1954.

Appellants contend, since they were and are the owners of land on Frazer's Island and the area involved was the bed of the river, that they are entitled to all accretions to their land on the island to the thread of the closed channel as a matter of right; that they were not required to take possession thereof; and that failure to do so did not forfeit such right unless someone actually had established the right thereto by adverse possession. With these principles we find no fault and they are supported by the authorities cited. See, Briard v. Hashberger, 107 Neb. 199, 185 N. W. 430; Higgins v. Adelson, *supra;* Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737; Conkey v. Knudsen, 143 Neb. 5, 8 N. W. 2d 538; 56 Am. Jur., Waters, § 479, p. 895, § 477, p. 892. Of course, James and Martin or appellees and Martin could have agreed upon their respective interests in the accretions adjoining their lands regardless of their exact legal rights. See Conkey v. Knudsen, 135 Neb. 890, 284 N. W. 737. Whether or not they actually did so we do not decide for it is not material to a decision herein.

But appellees' claim of right is not based on either accretion or adverse possession but on estoppel, consequently, neither of these principles has application here. In other words, the question presented is, do the facts as herein set forth estop appellants from asserting ownership to the lands herein involved?

In a comparable situation in Blodgett v. McMurtry, 34 Neb. 782, 52 N. W. 706, we said: "The rule is, where one by his own words or conduct willfully causes another to believe in a certain state of facts, as that he is not the owner of certain property, and thereby induces him to act on that belief so as to alter his own position, as by purchasing the same, the former is concluded from averring against the latter a different state of facts from that represented."

We said in Ricketts v. Scothorn, 57 Neb. 51, 77 N. W.

365, 73 Am. S. R. 491, 42 L. R. A. 794: "An estoppel in pais is defined to be 'a right arising from acts, admissions, or conduct which have induced a change of position in accordance with the real or apparent intention of the party against whom they are alleged.' Mr. Pomeroy has formulated the following definition: 'Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.' (2 Pomeroy, Equity Jurisprudence 804.)"

And in May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448, we said: " 'Equitable estoppels operate as effectually as technical estoppels. They cannot in the nature of things be subjected to fixed and settled rules of universal application, like legal estoppels, nor hampered by the narrow confines of a technical formula. So, while the attempted definitions of such an estoppel are numerous, few of them can be considered satisfactory, for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. * * * The following, however, may be ventured as the sum of all cases: That a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. Such an estoppel is founded on morality and justice, and especially concerns conscience and equity.' 10 R. C. L., sec. 19, p. 689. See, also, 31 C. J. S., sec. 59, p. 236." See, also, Reed v. Williamson,

ante p. 99, 82 N. W. 2d 18; Bleicher v. Heeter, 141 Neb. 787, 4 N. W. 2d 897; Neset v. Rudman, —— N. D. ——, 74 N. W. 2d 826; Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618; 31 C. J. S., Estoppel, § 63, p. 248.

As stated in Colonial Theatrical Enterprises v. Sage, 255 Mich. 160, 237 N. W. 529: " 'It has been held in many cases that if the owner of land knowingly stands by and permits his property to be mortgaged or sold by another, to one who is to the owner's knowledge relying on the apparent ownership of the person executing the conveyance, such conduct will estop the owner from asserting his title against the mortgagee or grantee.' Craig v. Crossman, 209 Mich. 462, 480."

"An equitable estoppel may be claimed by a party or privy, but not by a stranger or volunteer. * * * ordinarily estoppels in pais are available in favor of privies, provided the privity is created after the event out of which the estoppel arises, and provided the elements of such estoppel are present." 31 C. J. S., Estoppel, § 130, p. 397. In this respect appellees, as grantees of Vantine A. James, stood in privity with him as to his right to set up estoppel as a defense to any claims made by Martin.

Estoppel may be urged to protect rights, not to create them, but the principle here controlling is stated in Colonial Theatrical Enterprises v. Sage, *supra,* as follows: "In Stevens v. DeBar, supra (229 Mich. 215, 200 N. W. 978), with review of the authorities, it was said: 'This court has consistently held that title to real estate may not be created by estoppel, but in numerous cases this court has also held that a party may estop himself after the arrangements have been fully executed from asserting that the title he by his own acts has created or aided in creating is not the true title.' See, also, 50 A. L. R. 685."

Here the parties did not know what Martin claimed was his. They inquired of him in regard thereto and were informed. Relying upon such information they

acted thereon and expended their funds. To now permit Martin to assert otherwise would be inequitable and a fraud upon those who believed what he told them. We think he should be estopped from doing so. We therefore affirm the trial court's decision.

AFFIRMED.