369 N.W.2d 54 (1985)
220 Neb. 197
GRAND LODGE INDEPENDENT ORDER OF ODD FELLOWS OF NEBRASKA, Appellee,
v.
Lawrence D. MARVIN, Appellant, Diana Welstead Sandobal et al., Appellees.
No. 83-829.
Supreme Court of Nebraska.
June 14, 1985.
Avis R. Andrews, Fremont, for appellant.
Thomas B. Thomsen, Fremont, for appellee Grand Lodge.
*55 KRIVOSHA, C.J., and BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.
GRANT, Justice.
The defendant-appellant, Lawrence D. Marvin, appeals from the October 5, 1983, Dodge County District Court order overruling his motion for new trial. The district court, on December 2, 1982, found for plaintiff-appellee, Grand Lodge Independent Order of Odd Fellows of Nebraska, a nonprofit Nebraska corporation (hereinafter Grand Lodge), on a petition in ejectment removing Marvin from the south 44 feet and the north 4 feet of the south 48 feet of the west 89 feet of Lots 1 and 2 in Block 124 of the City of Fremont, as surveyed, platted, and recorded, in Dodge County, Nebraska. We reverse the decision of the district court, finding, as a matter of law, that the Grand Lodge is estopped from claiming Marvin's sales contract is not valid.
This case arises out of a real estate contract for the sale of property. The local lodge of the Independent Order of Odd Fellows, Centennial Lodge No. 59, in Fremont, Nebraska, a nonprofit Nebraska corporation (hereinafter Fremont Odd Fellows), signed a contract to sell its lodge building to Marvin and to Daniel W. Welstead, Sr., on December 4, 1976. The Fremont Odd Fellows had been in financial trouble and owed $26,574.90 in back taxes on the above-described property. In an effort to avoid the embarrassment of a tax foreclosure, the Fremont Odd Fellows negotiated with Marvin and Welstead for a sale of the property. On August 31, 1976, Marvin and Welstead paid the back taxes on the property, with the aid of $10,000 advanced by the Fremont Lodge. That day they expected to sign a sales contract for the property, but the officers of Fremont Odd Fellows did not appear at the courthouse or at Marvin's attorney's office as agreed. On December 4, 1976, after the delinquent taxes had been paid and before any communication with the Grand Lodge, the Fremont Odd Fellows signed the real estate contract in question. The contract required a deed conveying the property above described to Marvin and Welstead be placed in escrow at the Fremont National Bank & Trust Co. and delivered to Marvin and Welstead when the full purchase price had been paid. A warranty deed was executed by the Fremont Odd Fellows and placed in escrow as agreed. The sales contract listed the sale price of the property as $32,000, the downpayment as $26,574.90 ($10,000 of which had been advanced by the seller, Fremont Odd Fellows, to the buyers and used to pay the delinquent taxes), and the balance due under the contract as $15,625.10 (which included the $10,000 advanced by the lodge). Marvin and Welstead were also required to pay various other expenses of the sale and interest on the balance at the rate of 7 percent per annum simple interest. Marvin and Welstead's monthly payments to the Fremont Odd Fellows were set at $1,065. This amount was to be paid by monthly payments of $65 cash and $1,000 credit for rent of the building's basement to the Fremont Odd Fellows. The third year, the monthly payments increased to $1,165, $65 cash and $1,100 rental credit. The contract did not provide for payment of rent to the buyers after the third year nor a right of the sellers to rent any part of the building.
On the day that the real estate sales contract was signed, Marvin typed up a document stating that the Fremont Odd Fellows conducted a meeting on December 4, 1976, and certifying that the proper procedures for the sale were carried out according to the bylaws of the Fremont lodge, that the lodge had notified all members in writing, that two-thirds or more of the members had voted to sell, and that the Grand Lodge had given the Fremont Odd Fellows dispensation to sell. This document was signed by the Fremont Odd Fellows' noble grand, the financial secretary, two trustees, Welstead as a past trustee, and the president of the building board, and certified that the statements were true and that the exact minutes of the meeting would be looked up later. Marvin had never been a member of the Fremont *56 Odd Fellows, but was a lifetime member, and had been since 1964, of the Grand Lodge. Marvin testified that he typed up the document for the Fremont Odd Fellows' officers to sign, not at a meeting, but either at his attorney's office or in the Fremont lodge building while the Fremont officers were looking in the basement files for the dispensation they said they had obtained. Marvin also admitted that he knew the Fremont Odd Fellows needed dispensation from the Grand Lodge to sell the property, but he testified that each of the officers who signed the document attached to the real estate contract verbally assured him they had dispensation to sell. There was no testimony from any of the Fremont Odd Fellows who had signed the December 4, 1976, contract that Marvin's testimony was not correct.
The 1970-71 past grand master of the Grand Lodge testified that general dispensation to sell the property had been granted the Fremont Odd Fellows during his tenure but that specific approval to a sale was still necessary. He further testified that no mention was made to Fremont Odd Fellows of the need for future approval. This dispensation was the only one received by the Fremont Odd Fellows before the signing of the contract of December 4, 1976. After the contract was signed the Fremont Odd Fellows attempted to receive dispensation for the sale which had already occurred. On February 8, 1977, the Grand Lodge sent a letter to the Fremont Odd Fellows allowing it dispensation to sell. This first letter was followed by a second the same day, conditioning the permission on the approval of the sales contract. The evidence shows more than a year of correspondence between the two lodges attempting to get approval of various contracts, even though a contract had been signed on December 4, 1976, and a deed had been deposited in escrow. The minutes of the Fremont Odd Fellows' meetings throughout this period show that Marvin was considered to be the owner and the Fremont Odd Fellows the tenant.
Marvin had taken possession of the building, made regular payments to Fremont Odd Fellows, $1,065 and $1,165 (receiving $1,000 and $1,100 credit for rent to the lodge), paid the real estate taxes in 1977 and succeeding years, and took care of the other expenses of the building. In 1979 Fremont Odd Fellows became defunct, and, according to a provision in its constitution, all its property became the property of the Grand Lodge when it became defunct.
From the time the Fremont Odd Fellows became defunct until July 20, 1981, when the Grand Lodge filed its petition to eject Marvin, Marvin paid the property taxes and tendered the $65 a month to the Grand Lodge. The Grand Lodge, while not cashing any of the checks, allowed Marvin to pay the taxes and did not attempt to return the original downpayment to Marvin.
On July 20, 1981, the Grand Lodge filed a petition to eject the defendant Marvin (who, in the meantime, had purchased Welstead's interest in the property from Welstead's heirs) and for an accounting of the rents and profits. Trial was had to the court on October 12, 1982. On December 2, 1982, the trial court ordered that the Grand Lodge should recover the property in question. On September 7, 1983, the trial court issued "Findings of Fact and Conclusions of Law," which set out the damages to be awarded to the Grand Lodge from Marvin as $1,760.92.
Marvin timely appealed to this court from the denial of his motion for new trial. He sets out 22 assignments of error, only 1 of which is necessary for our disposition of this case: "The Court erred in failing to find that Plaintiff was estopped from denying the validity of the Real Estate Contract."
With regard to this assignment of error, the Grand Lodge contends that since Marvin did not specifically plead estoppel, he is barred from asserting that defense. We have held: "` "A party entitled to an estoppel need not in all cases formally plead the estoppel. If the facts constituting the estoppel are in any way sufficiently pleaded, he is entitled to the benefit of the law arising therefrom." ...'" Greer v. *57 Chelewski, 162 Neb. 450, 455, 76 N.W.2d 438, 442 (1956), quoting from earlier cases. See, also, Robbins v. National Life & Acc. Ins. Co., 182 Neb. 749, 157 N.W.2d 188 (1968). Marvin has pled such facts.
This case is difficult and confusing factually and procedurally in its creation and disposition. Both parties discuss a "reversionary interest" belonging to the Grand Lodge, although the record shows no prior title in the Grand Lodge. The second dispensation, or permission, of the Grand Lodge occurred after the minutes of Fremont Odd Fellows showed that a sales contract had already been signed, an event which occurred after the de facto sale of August 31, 1976, which apparently occurred when the downpayment was made, which occurred after possessionall precisely in reverse order of normal proceedings.
Despite this confusion, the Grand Lodge managed to file a petition which complied with Neb.Rev.Stat. § 25-2124 (Reissue 1979):
In an action for the recovery of real property, it shall be sufficient if the plaintiff states in his petition that he has a legal estate therein, and is entitled to the possession thereof, describing the same, and that the defendant unlawfully keeps him out of the possession. It shall not be necessary to state how the plaintiff's estate or ownership is derived.
The Grand Lodge pled that it had a legal estate in the property and was entitled to possession. Marvin, while not directly challenging the proof of the Grand Lodge's legal estate, claimed an equitable interest in the property under the December 4, 1976, sales contract and the warranty deed held in escrow, as a defense to the ejectment action. The Grand Lodge claimed the contract was voidable for lack of the Grand Lodge's dispensation as required by Fremont Odd Fellows' bylaws and constitution.
Whether there was dispensation for Fremont Odd Fellows to sell its lodge property was a factual question. If dispensation was given the local lodge, the sales contract is valid and Marvin has an equitable interest in the property, which precludes his ejectment. If, however, dispensation was not given, the contract is not valid unless Marvin is a bona fide purchaser without notice. In Bejot v. Ainsworth Lodge No. 130, I.O.O.F., 128 Neb. 631, 259 N.W. 745 (1935), we were faced with a case similar to the one before us. A local lodge of the Odd Fellows incurred some debts without the approval of the Grand Lodge and in violation of the constitution of the Grand Lodge and the bylaws of the local lodge. A third person, not familiar with the Grand Lodge or the local lodge, or their internal regulations, financed a mortgage signed by the local lodge. We held in that case that the constitution and bylaws of the Grand Lodge and local lodge were merely internal regulations and not binding on someone without actual or imputed knowledge of the provisions.
While the mortgagee in Bejot had no actual or imputed knowledge of the constitutional provisions limiting the contractual powers of the local lodge, in the case before us Marvin admitted he had actual knowledge of the dispensation requirement. Thus, Marvin is not a bona fide purchaser for value without knowledge, and the contract is voidable if dispensation was not given by the Grand Lodge.
While the real estate contract is voidable if no dispensation was given, it is clear under Nebraska law that Fremont Odd Fellows could not itself deny the validity of the contract. In O'Toole v. Yunghans, 211 Neb. 852, 857, 320 N.W.2d 768, 771 (1982), we said:
One may not acquire title to real estate by estoppel. Roll v. Martin, 164 Neb. 133, 82 N.W.2d 34 (1957). However, "`"a party may estop himself after the arrangements have been fully executed from asserting that the title he by his own acts has created or aided in creating is not the true title." ...'" Id. at 140, 82 N.W.2d at 39.
Ejectment is a legal action, but we have held an equitable defense of estoppel is appropriate. Abbas v. Demont, 152 Neb. 77, 40 N.W.2d 265 (1949).
*58 "`Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy.'..."
Roll v. Martin, 164 Neb. 133, 139, 82 N.W.2d 34, 38 (1957), citing 3 J. Pomeroy, A Treatise on Equity Jurisprudence § 804 (5th ed. 1941).
The fact is undisputed that the Fremont Odd Fellows asserted verbally and in writing that they had dispensation to sell the property to Marvin, and signed a contract and a warranty deed formally stating that fact. Marvin relied on the seller's statements when he signed the contract and paid the back taxes and continued to pay taxes and keep the building in repair. The Fremont Odd Fellows accepted those benefits and are now estopped from claiming there was no dispensation to sell the property.
The next question, then, is whether the Grand Lodge, which succeeded to title to the property of the Fremont Odd Fellows by the operation of internal brotherhood constitutions, is in privity with the Fremont Odd Fellows and subject to the estoppel defense of Marvin. Nebraska case law has not addressed the question of whether a successor corporation is in privity with the corporation it succeeds, and thus makes it liable to a defense of equitable estoppel. In Focht v. Wakefield, 145 Neb. 568, 576, 17 N.W.2d 627, 631 (1945), we held, "`An heir stands in privity with an ancestor, and an estoppel enforceable against the ancestor is likewise enforceable against the heir.'" The logic of binding privies, covering a wide range of persons and entities, to estoppel claims validly raised against the privy's predecessor is discussed in 31 C.J.S. Estoppel § 131 (1964). It has been held that a successor corporation is privy to the defunct corporation it succeeded and thus subject to the estoppel claims against the defunct corporation. See Union Provision & D. Corp. v. Thomas J. Fisher & Co., 49 A.2d 85 (D.C.1946).
For the same reasons that an heir must stand in privity with an ancestor for purposes of an equitable estoppel defense, we hold a successor corporation must stand in privity with the defunct corporation under which it claims an interest in title. Such a successor corporation is subject to the same equitable estoppel defense as the defunct corporation. Holding thus prevents the Grand Lodge from claiming a greater interest in the property than the predecessor Fremont Odd Fellows could claim. It is also consistent with our rule that only parties and privies may claim a defense of equitable estoppel. Armstrong v. Armstrong, 192 Neb. 11, 218 N.W.2d 541 (1974). In this case, making the Grand Lodge subject to Marvin's defense prevents it from regaining the property for which Marvin has expended his money and time, which the Fremont Odd Fellows freely accepted, and from which the Grand Lodge indirectly reaped the benefits.
We find that the Grand Lodge, under this case, is estopped from claiming that the December 4, 1976, contract was voidable because its dispensation was not given to the Fremont Odd Fellows. The remaining 21 assignments of error need not be considered. The cause is remanded to the district court with directions to dismiss the Grand Lodge's petition.
REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.
KRIVOSHA, C.J., and WHITE, J., concur in the result.