**FORD MOTOR CREDIT COMPANY, Plaintiff,**

v.

**Stanley J. GARNER and Virginia M. Garner, Defendants.**

Civ. No. F 87–248.

United States District Court, N.D. Indiana, Fort Wayne Division.

June 3, 1988.

Thomas W. Yoder, Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for plaintiff.

Jay H. Ham, III and Jeffrey A. Ayers, Baker & Daniels & Shoaff, Fort Wayne, Ind., for defendant.

## MEMORANDUM DECISION AND ORDER

WILLIAM C. LEE, District Judge.

A one day bench trial was held on April 21, 1988, and the court heard final argu-

ments on May 2, 1988. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rule of Civil Procedure 52(a), after having examined the entire record and after having determined the credibility of witnesses.

## I.

### Findings of Fact
#### A.

#### The Parties and Their Financing Agreement

Defendants Stanley and Virginia Garner have been residents of Fort Wayne and citizens of Indiana since 1978. In May, 1978, Stanley Garner, through Garner Lincoln-Mercury, Inc., became a dealer for Ford Motor Company's Lincoln-Mercury Division of Fort Wayne. Before coming to Fort Wayne, Mr. Garner had a 25% interest in a Ford dealership near New Orleans, Louisiana. That dealership was profitable and when Mr. Garner moved to Fort Wayne he received $250,000 for his interest in the Louisiana dealership.

Plaintiff Ford Motor Credit Company (FMCC), a wholly owned subsidiary of Ford Motor Company, provided financing for Mr. Garner so that he could acquire and operate the Fort Wayne Lincoln-Mercury dealership. FMCC is the financial arm of Ford Motor Company and it provides financial services for Ford and Lincoln-Mercury dealers. FMCC made a "capital loan" to Garner Lincoln-Mercury, Inc. in the amount of $250,000. Mr. Garner invested the $250,000 he had received from the Louisiana dealership. FMCC also accepted Garner Lincoln-Mercury, Inc. for its "automotive wholesale plan." This included "floor plan" financing, whereby FMCC extended to the dealership a line of credit to finance its inventory of Lincoln-Mercury vehicles.

Mr. Garner was the President and sole shareholder of Garner Lincoln-Mercury, Inc., until late 1979, when one of his employees acquired a 20% interest. As a requirement of financing, FMCC obtained from Mr. Garner a life insurance policy. On May 1, 1978, the Garners executed a "continuing guaranty," in favor of FMCC.[1] Stanley and Virginia Garner are the guarantors under the continuing guaranty and Garner Lincoln-Mercury, Inc. is the dealer.

Mr. Garner is a sophisticated businessman with substantial experience with financial activities of automobile dealerships. He graduated from the University of Detroit with a Bachelor's of Business Administration. His education included training in economics, business administration, and accounting. He worked as an accounting clerk and an accounting supervisor for General Motors, where he had supervisory responsibilities for anywhere from 14 to 20 dealerships. He then worked as a consultant to automobile dealerships for Jack Williams & Associates, where he was a one-third owner.

#### B.

#### The Garner Lincoln-Mercury Dealership

By the end of 1979, after having operated in Fort Wayne for approximately one and a half years, the Garner dealership was in trouble. Sales began to fall and interest rates rose. The high cost of gasoline diminished the demand for the rather inefficient Lincoln-Mercury automobiles. All of this coincided with the problems at Harvester and a poor economy in Fort Wayne, resulting in diminishing sales. These factors, over which Mr. Garner had no control, ultimately resulted in the financial failure of the Garner dealership.

---

**1.** Among other things, the guaranty requires that:

each of the undersigned Guarantors [the Garners] hereby, jointly and severally, and unconditionally, guaranties [sic] to you, your successors and assigns that the Dealer will fully, promptly and faithfully perform, pay and discharge all Dealer's present and future obligations to you, and agrees, without you first having to proceed against Dealer or to liquidate paper or any security therefor, to

pay on demand all sums due and to become due to you from Dealer and all losses, costs, attorney's fees or expenses which all losses, costs, attorney's fees or expenses which you may suffer by reason of Dealer's default, and agrees to be bound by and on demand to pay any deficiency established by a sale of paper or security held with or without notice to us; together with a reasonable attorney's fees [sic] (15% if permitted by law) if placed with an attorney for collection from us....

In late 1979, the dealership requested and received an additional capital loan from FMCC. Mr. Garner worked through George Bjorling, a Branch Manager for FMCC, in getting the additional capital. But the additional capital was not enough and Mr. Garner sought help from "Dealer Development," toward the latter part of 1979. Dealer Development is a part of FMCC which finances dealerships. Ultimately, FMCC's Dealer Development division declined the request for additional financing.

Garner Lincoln–Mercury was experiencing a severe cash crunch while it was awaiting assistance from Dealer Development. Dealers, like Garner Lincoln–Mercury, hold cars in trust for FMCC. They are normally expected to pay Ford off within a short time after a car is sold, i.e., 24 to 48 hours. In the midst of the cash crunch, Garner Lincoln–Mercury found itself extending this time from 24, to 48, to 72 hours, until there was eventually no money to pay Ford off at all. A total of nine cars were sold out of the trust (SOT).

### C.

*Garner Lincoln–Mercury's Liquidation and Bankruptcy*

In February, 1980, Garner Lincoln–Mercury shut its doors and began to liquidate its assets. Stan Garner and the Garner dealership cooperated fully with FMCC in the liquidation. In early February, 1980, the Garner dealership gave FMCC complete control over its assets. At FMCC's request, it delayed the bankruptcy of the dealership so that the filing occurred more than 90 days after the Garners turned over the dealership's assets to FMCC. The Garner dealership assisted FMCC in eliminating all of its losses from the nine units which were sold out of trust by applying moneys from used cars and other assets to those SOT losses.[2]

Throughout the establishment of the Garner dealership and its liquidation Mr. Garner dealt almost exclusively with Branch Manager George Bjorling. In January of 1980, Mr. Bjorling advised Mr. Garner that he and Mrs. Garner could be held personally responsible under the guaranty for any losses sustained by FMCC. Mr. Bjorling knew in March of 1980 that the Garners were considering personal bankruptcy.[3] And in March of 1980, Mr. Garner asked Mr. Bjorling if he could be released from the personal guaranty. Later, in May of 1980, Mr. Bjorling and Mr. Garner again talked about Garner's personal liability under the guaranty. In a casual conversation (see T.R., p. 193), Mr. Bjorling told Mr. Garner that FMCC would probably not pur-

---

**2.** There is a contention by FMCC that the SOT losses were never really eliminated; that while the records (*see* plaintiff's Exhibit 14) show no loss to Ford, there was in fact a loss on the SOT accounts. After weighing the credibility of the witnesses, and after reviewing all the pertinent exhibits, the court concludes that the SOT losses were in fact paid off, so that those losses were ultimately eliminated. Plaintiff's Exhibit 14 shows zero gross loss on all the SOT sales. Branch Manager Bjorling, who was in an excellent position to know, testified both at trial and in his deposition that FMCC ultimately sustained no losses on the SOT sales. *See* T.R., p. 46; Bjorling dep. pp. 44, 49. Marie Discher testified that money was applied to the SOT losses because of the high interest charged on that account and that if the money had not been applied there, it would have been applied somewhere else, so that the SOT losses never went away. But something went away when the dealership's assets were liquidated and the documentary evidence shows that it was the SOT account. Accordingly, the court discredits Discher's testimony on this point and holds that the SOT losses were eliminated during the liquidation. The court wishes to emphasize that this factual finding is made with some conviction and after considerable thought. The court believes that FMCC took the position that it took as an afterthought, for purposes related to potential future bankruptcy proceedings, and not because its position is supported by the facts.

**3.** Mr. Bjorling's own notes (*see* the back of defendant's Exhibit I) state that "Mr. Garner has requested consideration to a release from his guaranty to avoid personal bankruptcy. He further stated that with no personal assets at this point, he would be forced to personal bankruptcy if we were to pursue any deficiency." *See also* T.R., pp. 54–55. Mr. Garner's attorney had in fact drawn up personal bankruptcy papers which were never filed. They were never filed because Mr. Garner did not think FMCC would enforce the personal guaranty, based upon the conversation with Mr. Bjorling. *See* T.R., pp. 106–07.

sue the personal guaranty because of the Garner's negligible net worth.[4] At the time of this conversation, Mr. Garner knew that he had not been released from the guaranty, as a result of his March 1980 request.

The liquidation of the dealership was complete by January, 1981. By that time FMCC had recovered all but $171,942.66 on the dealership's inventory of Lincoln–Mercury vehicles. The wholesale prices for those vehicles, i.e., the dealer cost, totaled $1,575,738.87. FMCC had recovered all but $64,400.19 on the "capital loan," the principal balance of which was $224,998 on February 1, 1980. After January, 1981, FMCC accrued interest on the outstanding sums.

### D.

*Ford's Policies and Procedures Relating to Collectibility*

When a dealership's assets have been liquidated the dealer's account becomes a "closed status account." When the Garner Lincoln–Mercury dealership was liquidated in January, 1981, Branch Manager Bjorling contacted the dealer status coordinator and indicated, in accordance with Ford's guidelines (*see* defendants' Ex. V, p. 2), that the Garners were uncollectible and that he would submit a "recommendation to abandon." *See* defendants' Ex. T. But Mr. Bjorling never submitted a recommendation to abandon and in July of 1982 FMCC had decided to follow the Garners "annually or so until [they] become collectible." *See* defendants' Ex. T. This action was in accord with Ford's policy which provides

for review of a guarantor's status. *See* defendants' Ex. V, p. 3.

Ford's policies also provide that a demand should be made on guarantors at the time Ford seeks recovery on dealership obligations and also when the dealership's liquidation is complete. *See* T.R., p. 87; defendants' Ex. V, p. 3. Based upon the response to a demand, Ford's policies provide for semi-annual review of the guarantors and contact with the guarantor to arrange for payment or a settlement. *See* defendants' Ex. V, p. 3. After the liquidation, Ford did not contact the Garners or make a demand on their guaranty until 1985. *See* section E, *infra*. FMCC's delay of over four years (from January of 1981 to the mid part of 1985) in making a demand upon the Garners was a departure from its policy and from the general way in which it pursued guarantors.[5]

### E.

*Enforcement of the Personal Guaranty*

Mr. Bjorling felt that FMCC should not pursue the Garners on their personal guaranty. In fact, Mr. Bjorling told dealer status coordinator Anatolius Viskantis in April of 1981 that he would do a final investigation on the Garners and submit a recommendation to abandon the guaranty. *See* T.R., pp. 63–64. FMCC does have a formal procedure for abandonment of personal guarantys but that procedure was never followed in this case.

As a dealer status coordinator, Mr. Viskantis was responsible for overseeing the

---

**4.** There is no dispute that this conversation took place and that Mr. Bjorling said something to this effect. Bjorling does not deny the conversation, but testified at trial that he did not tell Mr. Garner that he did not have to worry about the personal guaranty. Attorney Hazelrigg's recollection was only that a "casual conversation" took place; he could not remember what was said. Mr. Garner distinctly remembered the essence of the message; he need not worry about FMCC pursuing the personal guaranty. Without pinning down the precise language, the court concludes that: (1) the conversation was a casual one; (2) Mr. Bjorling was responding to Mr. Garner's concern about the guaranty, a concern which had previously been expressed, and (3) Mr. Bjorling indicated that FMCC would not

likely pursue the Garners on their personal guaranty because of their negligible net worth.

**5.** Mr. Bjorling testified in his deposition that in 17 years as a branch manager he did *not* know of another instance where FMCC waited five years to make a demand upon a guarantor. *See* Bjorling dep., p. 132. Ms. Discher testified in her Rule 30(b)(6) deposition that she could not identify another dealership which had gone through corporate bankruptcy for which contact was not made with the guarantor for four years after the account was closed. *See* Discher dep., p. 104. She testified further that there was no "justification or policy reason" for the delay. Discher dep., pp. 76–77.

status of dealers who had come into financial difficulty. Mr. Viskantis had received information from Branch Manager Bjorling that the Garners were apparently uncollectible after the liquidation. *See* T.R., pp. 148–49. FMCC does not pursue personal guaranty deficiencies when the guarantors are uncollectible. The Garners did in fact have income from their muffler business during the years following the dealership's liquidation, but Mr. Viskantis had no knowledge of this income. Had he known of the income, FMCC may well have pursued the Garners before 1985.[6]

In 1985 after Mr. Viskantis had discovered the income, he called Mr. Garner and demanded payment of the balance due under the guaranty. In response to Viskantis' demand, Mr. Garner indicated that he was unable to pay. Mr. Viskantis suggested that Mr. Garner contact Mr. Bjorling; Mr. Viskantis also requested that Mr. Garner provide financial information. Mr. Garner never provided FMCC with any financial information. Mr. Viskantis never followed up his phone call with a letter to Mr. Garner, making a written demand. Mr. Bjorling and Mr. Garner did have lunch and Mr. Bjorling told Mr. Garner that FMCC probably wanted his financial data. After that meeting, Mr. Bjorling did not get back in touch with Mr. Garner. During both the phone conversation with Mr. Viskantis and the luncheon meeting with Mr. Bjorling, Mr. Garner never stated or indicated that he thought FMCC had abandoned its claim for moneys under the personal guaranty.

Mr. Garner did not hear from FMCC again until June 26, 1987, when he and his wife, Virginia, received a letter demanding payment of $600,414.46 under the continuing guaranty agreement. Follow-up letters threatening legal action were sent on July 20, 1987 and August 3, 1987. The outstanding balance on the guaranty totals $614,244.56, as of March 31, 1988. *See* plaintiff's Ex. 26. The Garners have failed to pay any amount to FMCC under the personal guaranty.

## II.

### Conclusions of Law

Unless the Garners' affirmative defenses or counterclaims provide refuge they will be liable to FMCC for the entire $614,244.56 due under the personal guaranty. Execution of the guaranty, a demand by FMCC and the amount owing have all been admitted by the Garners. And the Garners do not argue that the guaranty was modified for consideration or that they were released from its provisions. Instead, they assert the equitable defenses of laches and estoppel[7] and a number of counterclaims, including breach by FMCC of an implied duty of good faith and fair dealing, unfair discriminatory practices, and fraud.

### A.

### The Equitable Defenses of Laches and Estoppel

■ FMCC argues that the equitable defenses of laches and estoppel have no application in actions for the payment of money and are not available to the Garners. This is true for the defense of laches, both in Indiana and in other states. *See City of Lafayette v. Keen,* 113 Ind.App. 552, 48

---

**6.** I say "may well" rather than "would" because of the pendency of the corporate bankruptcy. The corporate bankruptcy proceeding was not closed until the latter half of 1984. FMCC will sometimes not pursue personal guarantors when a bankruptcy proceeding, even a corporate bankruptcy proceeding, is pending. *See* Discher dep., p. 82. This is because corporate bankruptcy creates uncertainty as to the amount of FMCC's losses. *See* T.R., p. 148. The record supports a finding that FMCC did not pursue the Garners until 1985 on their personal guaranty because Garner Lincoln–Mercury was in bankruptcy. While this is not the principal reason for FMCC's delay in pursuing the Garners on the guaranty (the uncollectibility is), it was a contributing factor. Thus, even if Mr. Viskantis had known of the muffler business income, he might not have pursued the Garners on their guaranty because of the pending bankruptcy.

**7.** The Garners' "Answer and Affirmative Defenses," filed on November 2, 1987, also listed waiver as an affirmative defense. But waiver was not briefed by the defendants and their attorney stated at oral argument that waiver was not being relied upon. Accordingly, the court will consider the waiver defense waived and will not discuss it further.

N.E.2d 63, 69–70 (1943) (en banc); *Kodiak Elec. Assn. v. Delaval Turbine, Inc.*, 694 P.2d 150 (Alaska 1984); *Jacoby v. Jacoby*, 150 Ga.App. 725, 258 S.E.2d 534 (1979). When a party invokes a legal right, as opposed to an equitable one, the sole line of demarcation for the assertion of the right is the statute of limitations. So the court agrees that the defense of laches is unavailable to the Garners.

■ But even FMCC's cases do not stand for the proposition that equitable estoppel is unavailable in an action for the payment of money. *See G.M. Morris Boat Co. v. Bishop*, 631 S.W.2d 84 (Mo.App.1982) (holding the defense of estoppel, but not laches, applicable to a suit at law). While no definitive Indiana cases were cited by FMCC on this issue, the court found that other jurisdictions have allowed the equitable defense of estoppel in legal actions. *See, e.g., Wenndt v. Alabama Great Southern Railroad Co.*, 292 Ala. 245, 292 So.2d 118 (1974); *Poksyla v. Sundholm*, 259 Minn. 125, 106 N.W.2d 202 (1960); *Grand Lodge Independent Order of Odd Fellows v. Marvin*, 220 Neb. 197, 369 N.W. 2d 54 (1985). Whether Indiana would allow this defense need not be decided in this case, however, because even if the defense were available to the Garners, the facts do not support the defense.

"In contrast to laches, which involves injury due to nonaction, estoppel is associated with positive conduct which misleads another person." *Alber v. Standard Heating and Air Conditioning*, 476 N.E.2d 507, 510 (Ind.App.1985). Equitable estoppel arises when:

1) a false representation or concealment of material fact is made with actual or constructive knowledge of the truth;

2) the representation is made to one who is without knowledge or scienter, with the intent that he or she will rely upon it; and

3) the second party relies upon the falsehood to his or her detriment.

*Alber*, 476 N.E.2d at 510, citing *Coghill v. Badger*, 418 N.E.2d 1201 (Ind.App.1981). *See also Clark v. Millikin Mortg. Co.*, 495 N.E.2d 544, 547 (Ind.App.1986). The Gar-

ners carry the burden of proving all of the facts necessary to establish estoppel. *Phar-Crest Land Corp. v. Therber*, 251 Ind. 674, 244 N.E.2d 644 (1969).

In this case, the Garners have not shown that FMCC made a false representation of material fact with actual or constructive knowledge of the truth. It is true that Mr. Bjorling told Mr. Garner that FMCC would not pursue enforcement of the personal guaranty and that this in fact turned out to be false to the Garners' chagrin. But there is no evidence that Mr. Bjorling knew that FMCC would pursue the Garners and evidence of that kind is required to establish the first element of the defense. *See Hutter v. Weiss*, 132 Ind.App. 244, 177 N.E.2d 339 (1961). The Garners might argue that Mr. Bjorling's ignorance of the facts was inexcusable negligence, *see Seymour Improvement Co. v. Viking Sprinkler Co.*, 87 Ind.App. 179, 161 N.E. 389 (1928), but that argument cannot succeed unless the Garners themselves were without a convenient and available means of acquiring knowledge of the true facts, *see Matthews v. Bowser*, 135 Ind.App. 513, 195 N.E.2d 494 (1964), and that is clearly not the case here. There is a big difference between making a false statement and making a false statement with knowledge of the truth.

The Garners have also failed to establish the second element of the defense. There is no evidence that Mr. Bjorling's unfortunate statement was made with the intent that the Garners would rely upon it. To the contrary, the statement was made in a casual conversation. Mr. Bjorling and Mr. Garner were personal friends and the preponderance of the evidence suggests at most that Mr. Bjorling's statement represented the wishful thinking of a friend. But wishful thinking is not enough. While intent to deceive is not required a representation must be made with the intention that it will be acted upon. *Sheraton Corp. of America v. Kingsford Packing Co., Inc.*, 162 Ind.App. 470, 319 N.E.2d 852 (1974). That kind of intent has not been shown.

■ The court notes additionally that it would be a bit incongruous to hold that the

Garners had established the defense of estoppel even if the first and second elements had been supported by the evidence. It is universally accepted in Indiana that he who seeks equity must do equity. *Sicanoff v. Miller*, 131 Ind.App. 535, 167 N.E.2d 481 (1960). And a party petitioning for equitable relief must come before the court with clean hands. *Ferguson v. Boyd*, 169 Ind. 537, 81 N.E. 71 (1907). If Mr. Bjorling's statement to Mr. Garner raises a suggestion that FMCC should be estopped from pursuing liability on the personal guaranty, the suggestion is firmly rebutted by Mr. Garner's failure to ever ask FMCC whether he would be pursued on the guaranty. It seems at least slightly inequitable for a party to sit idly by for five or six years hoping that a creditor will not pursue him and then cry foul when it does.

### B.

### Breach of Duty of Good Faith and Fair Dealing

Both the Uniform Commercial Code and the RESTATEMENT (SECOND) OF CONTRACTS impose obligations of good faith in the performance and enforcement of contracts. The Garners rely upon both to supply a duty of good faith on FMCC's part. FMCC argues that neither the Uniform Commercial Code nor the RESTATEMENT apply in this case.

■ The court agrees with FMCC that I.C. 26–1–1–203 [8] is inapplicable. The duty of good faith supplied by Indiana's Uniform Commercial Code is specifically restricted to contracts "within IC 26–1" and cannot be extended to cover the guaranty agreement in this case. *See, e.g., Crown Life Ins. Co. v. La Bonte*, 111 Wis.2d 26, 330 N.W.2d 201 (1983). So if the Garners are going to argue that FMCC breached its duty of good faith, the basis for their argument will have to come from the RESTATEMENT.

In *Prudential Ins. Co. of America v. Crouch*, 606 F.Supp. 464, 469 (S.D.Ind. 1985), the court relied upon the RESTATEMENT (2d) OF CONTRACTS to find that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." [9] FMCC concedes that Indiana law recognizes a duty of good faith in insurance contracts, so that an insurer cannot, for example, fail to settle a claim which cannot in good faith be disputed. *See Liberty Mutual Ins. Co. v. Parkinson*, 487 N.E.2d 162, 164–65 (Ind. App.1985), and cases cited therein. But FMCC argues that Indiana case law (aside from application of the Uniform Commercial Code) only recognizes this duty in insurance contract cases and not in contract cases generally.

In making this argument FMCC is forced to confront *Crouch*. While the plaintiff in *Crouch* was an insurance company, *Crouch* is not an insurance case in the sense that *Parkinson, supra*, is an insurance case. *Parkinson*, and other cases like it, find the duty of good faith between the insurer and its insured, based in part upon a fiduciary relationship. *Parkinson*, 487 N.E.2d at 164. The insurer in *Crouch* successfully sued its former employee for selling insurance to his old clients. *Crouch*, 606 F.Supp. at 467. Prudential argued, among other things, that Mr. Crouch breached a duty of good faith in his employment contract. *Id.* at 469. *Crouch* is really an employment contract case and seems to directly contradict the plaintiff's assertion that a duty of good faith only applies in insurance cases.

Realizing the problem posed by *Crouch*, FMCC argues that *Crouch* is bad law, that no Indiana case has ever recognized a duty of good faith outside the realm of UCC or insurance law. The court was unable to find any Indiana case explicitly recognizing a duty of good faith in contracts generally and the case cited in *Crouch, Ang. v. Hos-*

---

**8.** I.C. 26–1–1–203, which was amended, effective March 3, 1986, states that:

Every contract or duty within [I.C. 26–1] imposes an obligation of good faith in its performance or enforcement.

**9.** The RESTATEMENT (SECOND) OF CONTRACTS § 205 (1986), states:

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

*pital Corp. of America,* 182 Ind.App. 381, 395 N.E.2d 441 (1979), does not rely upon the RESTATEMENT (SECOND) OF CONTRACTS or recognize a general duty of good faith implied in all contracts. Rather, it infers in the specific contract at issue, the contractual term of good faith, to give meaning to the intention of the parties. *Id.* 395 N.E.2d at 444. *See also Coleman v. Chapman,* 139 Ind.App. 385, 220 N.E.2d 285 (1966) (courts may infer terms to give meaning to the intention of the parties). It might appear, therefore, that *Crouch* went too far in recognizing § 205's duty of good faith.

▮▮ But the court does not read *Crouch* as broadly as FMCC does. Read most narrowly, *Crouch* stands for the proposition that the implied covenant of good faith and fair dealing prevents an "insurance agent from destroying his former employer's right to keep and enjoy premiums which were received *during* the employment ..." of the agent. *Crouch,* 606 F.Supp. at 470 (emphasis in original). The court explicitly held that this rule had been "recognized in other jurisdictions and is not inconsistent with the law in Indiana." *Id.* Instead of explicitly recognizing a broad general rule, the court recognized a very narrow rule which was "not inconsistent" with Indiana law. While *Crouch* could be read more broadly, *see id.* at 469, the court believes that this more narrow reading is the fairest and most accurate one.

This court does not think *Crouch* can be disregarded as bad law and if its specific holding was applicable in this case, the court would follow it, as the doctrine of *stare decisis* compels. *See Colby v. J.C. Penney Co., Inc.,* 811 F.2d 1119, 1123 (7th Cir.1987). But *Crouch* is distinguishable from this case and does not supply a general duty of good faith and fair dealing to all contracts in Indiana. While such a duty seems manifestly reasonable and while Indiana courts have followed other portions of the RESTATEMENT OF CONTRACTS, *see Cantwell v. Cantwell,* 237 Ind. 168, 143 N.E.2d 275 (1957), this court must do its best to follow Indiana law as it exists, without grafting on even seemingly reasonable rules to those which exist. Accordingly, the court holds that while *Crouch* is good law, it does not, as the Garners suggest, impose upon FMCC a duty of good faith and fair dealing in the performance and enforcement of the guaranty.[10]

## C.

### Unfair Discriminatory Practices

▮ The Garners argue that FMCC unfairly discriminated against them in the enforcement of the guaranty. Indiana's "Motor Vehicle Manufacturers, Distributors, and Dealers" statute makes it unlawful for manufacturers or distributors to "[v]iolate the provisions of I.C. 23–2–2.7." *See* I.C. 9–10–3–2. Indiana Code 23–2–2.7 is the "Deceptive Franchise Practices" Act and it prohibits franchisors from discrimi-

---

**10.** All of this is somewhat academic anyway, since the facts in this case do not show that FMCC breached its duty of good faith and fair dealing, assuming *arguendo,* that such a duty exists. Good faith has been defined as honesty in fact. *See Van Bibber v. Norris,* 275 Ind. 555, 419 N.E.2d 115, 122 (1981) (applying UCC definition). While *Van Bibber* is a UCC case, Indiana courts look to the UCC for guidance even in non-UCC cases. *See Weaver v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144, 146 (1972). The Garners' brief does not explain what FMCC might have done to breach a duty of good faith and fair dealing, but their attorney, Mr. Ham, explained at closing argument with some alacrity, that the breach arose *out of no single act,* but rather, from the "totality of circumstances." These circumstances include two *basic* elements: Mr. Bjorling's inaccurate statement to Mr. Garner regarding FMCC's intentions of pursuing the guaranty and the delay from early 1980 until 1985 (when Mr. Garner was contacted by Mr. Viskantis), and ultimately June of 1987 (when a formal demand was made), in enforcing the guaranty. But even the totality of the circumstances, while they raise considerable sympathy, do not amount to bad faith or unfair dealing. Mr. Bjorling's representation to Mr. Garner was based on Mr. Garner's negligible net worth in 1980. FMCC did not learn that things had changed until 1985, when the muffler business income was discovered. Perhaps FMCC should have been more diligent in keeping track of the Garners' net worth after 1980, but their failure to do so amounts to incompetence at most, particularly in view of the pending corporate bankruptcy.

nating unfairly among franchisees.[11] Before reaching the question of unfair discrimination the court must decide whether FMCC is a manufacturer within the meaning of I.C. 9–10–3–2.

FMCC did not brief the question of whether it is a manufacturer for purposes of I.C. 9–10–3–2. The statute defines manufacturer as a person engaged in manufacturing or assembling vehicles *and* selling vehicles.[12] FMCC does neither and is not, therefore, a manufacturer within the plain meaning of the Act.

It could have been argued, as has been argued under the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, *et seq.* (1976), that even non-manufacturers who are in reality only instrumentalities, or who are subject to the manufacturer's control, or who are alter egos, should be considered as manufacturers for purposes of the Act. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 550 F.Supp. 1199, 1201–02 (N.D. Ill. 1982), and cases cited therein. But this argument would fail because of the important difference in the way the word manufacturer is defined under the two Acts. The federal statute defines a manufacturer as a person who manufactures or assembles cars *or* a corporation which "acts for and is under the control of such manufacturer...." 15 U.S.C. § 1221(a). The state statute contains no similar language which would allow this court to hold that FMCC, as a non-manufacturer, is a manufacturer for the purposes of I.C. 9–10–3–2.

■ Assuming this initial hurdle was successfully jumped, so that I.C. 23–2–2.7–2(5) applied in this case, the Garners would be immediately confronted with a second obstacle. The Deceptive Practices Franchise Act prohibits unfair discrimination among franchisees or dealers as the Garners argue.[13] Garner Lincoln–Mercury, Inc. is the franchisee (or dealer) in this case, the Garners are not. But the Garners cite a string of cases which hold that non-dealers may invoke the protections of the Federal Dealers Day in Court Act. *See Kavanaugh v. Ford Motor Co.*, 353 F.2d 710 (7th Cir.1965); *John Peterson Motors, Inc. v. General Motors Corp.*, 613 F.Supp. 887, 903 (D.Minn.1985); *DeValk*, 550 F.Supp. at 1203–04. As the following analysis will show, however, each of these cases represents instances in which departure from the general rule was well justified.

The general rule under the federal statute is that only the corporation may seek protection under the Act when the dealer is a corporate entity. *John Peterson*, 613 F.Supp. at 903; *Schmitt–Norton Ford, Inc. v. Ford Motor Co.*, 524 F.Supp. 1099, 1104–05 (D.Minn.1981). In *Kavanaugh,* the court pierced the corporate veil and held that Mr. Kavanaugh was a "dealer" within the meaning of the Act, given various contracts which considered him the dealer, given the fact that both parties considered him the intended dealer, and given the Act's fundamental purpose of balancing the power now weighted heavily in favor of manufacturers. *Kavanaugh,* 353 F.2d at 710. In *John Peterson,* the court held that Peterson was a "dealer" within the meaning of the Act because he was the president, the sole shareholder and

---

11. Indiana Code 23–2–2.7–2, provides that:
 It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is a resident of Indiana to engage in any of these acts and practices in relation to the agreement:
 (5) *discriminating unfairly* among its franchisees, or unreasonably failing or refusing to comply with any terms of a franchise agreement;
 (Emphasis added).

12. Indiana Code 9–10–1–1 defines a manufacturer as
 a person who is engaged in the business of manufacturing, or assembling motor vehicles or their major component parts, or both, and sells motor vehicles to dealers, wholesale dealers, distributors, or the general public. The term includes a factory branch office of the manufacturer or an authorized representative of the manufacturer.

13. Indiana Code 23–2–2.7–2 prohibits discrimination against franchisees only, FMCC argues. The Garners argue that I.C. 9–10–3–2 incorporates I.C. 23–2–2.7–2, so that that section applies to dealers and that "dealers" are defined as natural persons who sell at least twelve (12) cars for delivery in Indiana each year. *See* I.C. 9–10–1–1.

the director, so that the corporation was merely an alter ego of Peterson. *John Peterson*, 613 F.Supp. at 903. And in *De-Valk*, the court held that dismissal of two shareholders would be improper, drawing all inferences in their favor. *DeValk*, 550 F.Supp. at 1203–04.

Before looking at Mr. Garner's relationship to Garner Lincoln–Mercury, Inc., the court emphasizes that each of these cases dealt with the federal Act and are cited only as analogous authorities. Moreover, these cases represent departures from the general rule. Unless a plaintiff can make out a legitimate reason for finding an exception to the general rule, the general rule must be applied. *See Schmitt–Norton*, 524 F.Supp. at 1107. The Garners argue that in 1980 Mr. Garner was an 80% stockholder in the dealership and that he and his wife invested everything they had in the dealership. But those facts, while they suggest a very close relationship between Mr. Garner and the corporation, do not rise to the level which compelled the *Kavanaugh, John Peterson*, and *DeValk* courts to depart from the general rule. While this is a close question, the court holds that the Garners are not dealers within the meaning of the Indiana Act.

 If they were, and still assuming the first hurdle had been overcome, the court would have to decide whether FMCC (as a "manufacturer") had "discriminated *unfairly*" against the Garners ("franchisees" or "dealers"). *See* n. 11, *infra.* The evidence supports the conclusion that the Garners were discriminated against (treated differently) in the enforcement of the guaranty. *See Findings of Fact,* pp. 7–8. It does not, however, support the conclusion that they were unfairly discriminated against. The word unfairly is used in I.C. 23–2–2.7–2(5) to modify the word discriminated, so that only discrimination which is not fair discrimination is actionable under I.C. 23–2–2.7–2(5).

An analogy can be found in employment discrimination cases, where the *McDonnell Douglas–Burdine* three step paradigm is applied. *See Reeder–Baker v. Lincoln Nat. Corp.,* 649 F.Supp. 647 (N.D.Ind. 1986), *aff'd* 834 F.2d 1373 (7th Cir.1987); *Beard v. Whitley County REMC,* 656 F.Supp. 1461 (N.D.Ind.1987), *aff'd* 840 F.2d 405 (7th Cir.1988). If a prima facie case of discrimination is proved by the plaintiff, then the burden of production shifts to the defendant to offer a legitimate non-discriminatory reason for its action—that is, that it did what it did for some legitimate (i.e., non-race, non-sex, non-retaliatory) reason. It matters not what the reason is so long as it is non-discriminatory. Thus, even bad reasons are good enough, so long as they are non-discriminatory. *See Pollard v. REA Magnet Wire,* 824 F.2d 557 (7th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). If the prima facie case is rebutted, then the plaintiff has to prove that the proffered reason is pretextual, that a discrimination reason more likely motivated the employer.

FMCC discriminated against the Garners (treated them differently) by waiting so long to enforce the guaranty. But FMCC offered two fair reasons for its delay (discrimination) in enforcing the guaranty: (1) FMCC had no knowledge that the Garners had any income before 1985; and (2) the corporation was in bankruptcy, so that the losses were not clearly established. These are clearly non-discriminatory (fair) reasons for the way the Garners were treated and there is no real suggestion that these reasons are pretextual. Accordingly, the court finds that FMCC did not unfairly discriminate against the Garners.

### D.

### *Fraud*

 The Garners allege in Count IV of their counterclaim that FMCC fraudulently misrepresented their policies regarding the pursuit of guarantors. Indiana, however, requires "evidence that a material representation of past or existing fact" be made and the representation must be "untrue and known to be untrue," or else recklessly made, before fraud is established. *Peoples Trust Bank v. Braun,* 443 N.E.2d 875, 877 (Ind.App.1983). *See also Lesher v. Baltimore Football Club,* 496 N.E.2d 785, 790 (Ind.App.1986). And promises to do an act

in the future are not sufficient. *Lesher,* 496 N.E.2d at 790. The case relied upon by the Garners, *Groves v. First National Bank of Valparaiso,* 518 N.E.2d 819 (Ind. App.1988), does nothing to alter these principles. Nothing Mr. Bjorling said, nothing FMCC represented to the Garners or failed to represent to the Garners regarding its policies of pursuing guarantors, amounts to a fraudulent representation of any past or existing fact, known to be untrue, or recklessly made. The fraud claim must fail.

### III.

#### *Conclusion*

As noted at the outset, this case turned upon the well briefed and thoughtfully argued defenses and counterclaims of the Garners. While the court developed considerable sympathy for the Garners, none of their defenses or counterclaims provide them with refuge. They are liable to FMCC for $614,244.56, the entire amount due under the continuing guaranty and final judgment is entered accordingly.