**DAYS INN WORLDWIDE, INC.,
Plaintiff/Counterclaim
Defendant**

v.

**SAI BABA, INC., et al., Defendants/Counterclaim
Plaintiffs.**

No. 3:03CV7148.

United States District Court,
N.D. Ohio,
Western Division.

Jan. 26, 2004.

Eric B. Levasseur, Hahn, Erica L. Calderas, Nancy A. Oliver, Steven A. Goldfarb, Hahn, Rose Marie Fiore, Hahn, Loeser & Parks, Cleveland, OH, for Days Inns Worldwide, Inc., fka Days Inns of America, Inc., Plaintiffs.

Mark D. Wagoner, Jr., Shumaker, Loop & Kendrick, Toledo, OH, for Sai Baba, Inc., Anil Megha, Rakesh Megha, Defendants.

## ORDER

CARR, District Judge.

This is a contract case in which plaintiff Days Inn Worldwide, Inc. ("Days Inn") accuses defendants Sai Baba, Inc. ("Sai Baba"), Anil Megha, and Rakesh Megha of failing to meet their contractual obligations under a franchise license agreement. Defendants have filed six counterclaims against plaintiff, alleging that it acted improperly during the course of their contractual relationship. This court has jurisdiction pursuant to 28 U.S.C. § 1332.

Pending is plaintiff/counterclaim defendant Days Inn's Fed.R.Civ.P. 12(b)(6) motion to dismiss the counterclaims. For the following reasons, that motion will be granted in part and denied in part.

## BACKGROUND

Defendants Anil and Rakesh Megha are residents of Indiana and owners of defendant Sai Baba, Inc., an Ohio corporation. Until late 2002, defendants operated a hotel in Van Wert, Ohio pursuant to a franchise agreement with plaintiff. Plaintiff Days Inn is a large national hotel franchisor, and is a Delaware corporation with its principal place of business in New Jersey.

Defendants operated the Van Wert Days Inn hotel for approximately ten years before expiration of their first license agreement in 1999. The parties executed a second license agreement on June 23, 1999.[1]

---

1. The second license agreement contains a forum selection clause stating that the agreement "will be governed by and construed under the laws of the State of New Jersey." (Doc. 1 exh. A, at 18). The agreement also contains an integration clause that provides "[t]his Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations,

Defendants continued to operate their hotel as a Days Inn hotel until late 2002, when plaintiff terminated the license agreement and filed the instant suit for damages. Plaintiff claims that it terminated the agreement because defendants' hotel repeatedly failed to meet minimum quality assurance standards as required in the license agreement.

Defendants allege six counterclaims for: 1) equitable reformation of contract; 2) breach of an implied covenant of good faith and fair dealing; 3) violation of the Indiana Deceptive Franchise Practices Act, Indiana Code Ann. § 23–2–2.7–1; 4) declaratory judgment; and 5) tortious interference with prospective business relationships. Plaintiff alleges that defendants' complaint fails to state any claim on which relief can be granted and therefore requests that the court dismiss each of defendants' counterclaims.

## A. Equitable Reformation Counterclaim

Defendants' claim for equitable reformation alleges that the June 23, 1999, license agreement is null and void according to a provision agreed upon by the parties but not included in the final version of the contract. Defendants allege that on November 1, 1998, they signed and returned to plaintiff a "slip page" that altered the standard license agreement and stated:

*Conditions for a Legally Binding Contract.* All parties (we & you) hereto understand and agree that in the event said Days Inn fails to score a minimum of 425 points for quality assurance on or before November 8, 1999, then this entire license agreement, any and all documents related thereto, all notes executed by you, or any other evidence of indebtedness executed by you to us or any

agreements and understandings, oral or writ-

related parties shall become null and void; no franchise granted to you.

(Doc. 35, at 15).

This alteration was not included in the license agreement attached to plaintiff's complaint; plaintiff denies that this term was ever agreed on as part of the license agreement. Defendants claim that they did not know that this term had been omitted because they never received a final copy of the entire license agreement incorporating all of the "slip page" alterations to which they agreed. Defendants state that they repeatedly asked plaintiff for a complete copy of the agreement, but never received one.

Defendants' hotel failed to earn a quality assurance score of at least 425 prior to November 8, 1999. Thus, defendants contend, pursuant to the foregoing condition, the entire license agreement became "null and void."

## B. Breach of Implied Covenant of Good Faith and Fair Dealing Counterclaim

According to defendants, plaintiff instituted a program called "Project Restore" in August, 2002, as "a concerted effort to remove up to 300 properties from the Days Inn system and to increase [plaintiff's] profitability." (Doc. 35, at 17). Plaintiff terminated the license agreement with defendants on the same day it announced "Project Restore." Defendants allege that this action was a breach of the implied covenant of good faith and fair dealing because plaintiff "manufactured" defendants' quality assurance defaults to "meet its goal of terminating 300 franchises and collecting liquidated damages from [them.]" (*Id.* at 18).

Additionally, defendants allege that plaintiff breached the implied covenant of good faith and fair dealing by misrepre-

ten) of the parties . . . ." (*Id.* at 19).

senting the status of defendants' hotel through its national phone reservation system. Plaintiff operates the reservation system as a service to its franchisees. The service allows prospective customers to call a single phone number to make reservations at the Days Inn hotel in the area to which they are planning to travel.

Sometime between 1999–2002, plaintiff discontinued this reservation service for defendants' hotel, citing as its reason defendants' alleged repeated failure to meet minimum quality assurance standards. Defendants allege that plaintiff acted in bad faith when it discontinued the service because it misrepresented to callers that defendants' hotel was fully booked and had no rooms available, even though this was not true.

### C. Indiana Deceptive Franchise Practices Act Counterclaim

Defendants claim that plaintiff has violated the Indiana Deceptive Franchise Practices Act by failing to have good cause for the termination of the license agreement, modifying the license agreement without obtaining defendants' consent in writing, and "engaging in deceptive acts in connection with the franchise." (Doc. 35, at 19).

Defendants argue that Indiana law applies in this situation because defendants Anil and Rakesh Megha, residents of Indiana, are the alter ego of defendant Sai Baba, Inc., the franchisee, and are therefore franchisees for the purposes of the Indiana Act.

### D. Tortious Interference with Prospective Business Relationships Counterclaim

Defendants' claim for tortious interference with prospective business relationships is based on plaintiff's alleged actions in connection with its decision to discontinue its national reservation system service for defendants' hotel. Defendants allege that plaintiff committed a tort by misrepresenting the availability of defendants' hotel to reservation system callers by claiming that defendants' hotel was fully booked and had no rooms available. Defendants argue that this misrepresentation "improperly diverted business away" (Doc. 40, at 18) from their hotel and directed callers to another Days Inn about ten miles from defendants' hotel.

### STANDARD OF REVIEW

When ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court reads the complaint in the light most favorable to the complaining party, and all of the complaining party's factual allegations are accepted as true. *Dugan v. Brooks*, 818 F.2d 513, 516 (6th Cir.1987). The court's task is to determine not whether the complaining party will prevail on its claims but whether it is entitled to offer evidence to support those claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal is appropriate only if it appears beyond doubt that the complaining party can prove no set of facts in support of the claims that would entitle him or her to relief. *Pfennig v. Household Credit Servs.*, 295 F.3d 522, 525–26 (6th Cir.2002) (citing *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir.1998)).

### DISCUSSION

### A. Equitable Reformation Counterclaim

■ Defendants seek to reform the second license agreement to include the language from a slip page, which they allege was not, but should have been, included in the final version of the June 23, 1999 license agreement. This provision, according to defendants, would make the contract voidable because defendants' hotel failed to

earn a quality assurance score of at least 425 by November 8, 1999.

■ Under New Jersey law, "[t]he basic principle applicable to reformation of contracts is that a court, in reforming a contract, may not impose an agreement more favorable to either party than was intended." *Town of Secaucus v. City of Jersey City*, 19 N.J.Tax 10, 42 (N.J.Tax 2000) (citing *St. Pius X House of Retreats v. Diocese of Camden*, 88 N.J. 571, 443 A.2d 1052, 1066–67 (1982)). The equitable remedy of reformation is available when "it would serve to effectuate the true intention of the parties and would not otherwise defeat or distort their intent as to other terms of the contract." *St. Pius X House of Retreats*, 443 A.2d at 1067.

■ Plaintiff, however, claims that the parol evidence rule applies to bar the application of equitable reformation in this case. The parol evidence rule states that "a binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them." *Restatement (Second) of Contracts* § 213(1) (1981). New Jersey recognizes the rule. "Where the parties have made the writing the sole repository of their bargain, there is the integration which precludes evidence to antecedent understandings and negotiations to vary or contradict the writing." *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 657 (1953). Because the parties in the instant case have made both the license agreement and the alleged content of the slip page part of the record at this point in the proceedings, it is proper for the court to consider the application of the parol evidence rule to the facts at issue on this motion to dismiss. It is not true, as defendants assert, that the parol evidence rule is inapplicable to the facts in the instant case because the execution of the contract is at issue. Defendants are seeking equitable reformation of the contract, not a

determination that its execution was achieved by fraud or misrepresentation. Equitable reformation, by its definition, allows a court to *reform* the contract to reflect the parties' intent when its written terms do not comport with their understanding. To reform a contract, the court must assume that it was validly executed. *See St. Pius X House of Retreats*, 443 A.2d at 1066 ("Where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, ... and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed ....") (quoting *Restatement of Contracts* § 504 (1932)).

■ A court "must make preliminary determinations that there is an integrated agreement and that it is inconsistent with the term in question." *Restatement (Second) of Contracts*, § 213 cmt. b. The license agreement was signed by both parties on June 23, 1999. The court presumes that each party read and understood the agreement: "It is a general rule that where a party affixes his signature to a written instrument ... a conclusive presumption arises that he read, understood and assented to its terms and he will not be heard to complain that he did not comprehend the effect of his act of signing." *Kero v. Terminal Const. Corp.*, 6 N.J. 361, 78 A.2d 814, 817 (1951).

The agreement contains an integration clause which states that "[t]his Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the [hotel]." (Doc. 1 exh. A, at 19). Therefore, I find that the license agreement is a valid, integrated agreement.

Section 3.1 of the license agreement, entitled "Your Improvement and Operat-

ing Obligations," lists the improvement obligations to which defendants agreed and the quality assurance scores defendants' hotel was required to earn.[2] These requirements contradict the slip page defendants allege should have been included in the final agreement. Section 3.1 requires defendants' hotel to score 400 points within ninety days of the effective date of the agreement, and 425 points within nine months of the effective date. These terms directly contradict the slip page's term requiring the hotel to earn 425 points by November 8, 1999—less than five months after the effective date of June 23, 1999.

Moreover, section 3.1 of the agreement states that plaintiff retained the "sole discretion" to terminate the agreement if defendants failed to undertake required improvements and defendants' hotel failed to earn the necessary quality assurance points by the stated dates. This term directly contradicts the slip page's term stating that the agreement would become null and void automatically if the hotel failed to achieve 425 points by November 8, 1999. Thus, the slip page defendants seek to integrate into the agreement directly contradicts terms contained within the June 23, 1999 writing.

The parol evidence rule, therefore, applies in the instant case to bar integration of the slip page language defendants assert should have been included in the final license agreement. This court, accordingly, may not order equitable reformation of the license agreement, even if all of the facts alleged in defendants' counterclaim are true.

Defendants have failed to state a claim on which relief can be granted, and plaintiff's motion to dismiss the equitable reformation counterclaim will be granted.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing Counterclaim

 "A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 773 A.2d 1121, 1126 (2001). The purpose of the covenant is to ensure that parties honestly and reasonably carry out their contractual obligations. Implied covenants "are as effective components of an agreement as those covenants that are express." *Id.* (citing *Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675 (1984)).

 Defendants allege that plaintiff's actions with regard to its "Project Re-

---

**2.** Section 3.1 of the June 23, 1999 license agreement states in full:

> **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date. The Facility must score 400 points (or equivalent) within ninety (90) days after the Effective Date and 425 points (or equivalent) within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during reno-

> vation. If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted.

(Doc. 1 exh. A, at 1–2).

store" and its discontinuance of its phone reservation system for defendants' hotel breached the implied covenant. Under New Jersey law, the implied covenant of good faith and fair dealing "cannot override an express term in a contract," but "a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." *Wilson*, 773 A.2d at 1126. This is because the covenant protects parties against the possibility that another party will carry out its obligations under the contract in bad faith or with an aim to harm the other party or undermine the purpose of the agreement. *See Restatement (Second) of Contracts* § 205 (1981) ("[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . ."); *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 690 A.2d 575, 587 (1997) ("In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .").

■ Defendants' claims that plaintiff violated the implied covenant to act in good faith and to engage in fair dealing are supported by allegations that suggest that plaintiff took actions outside of the scope of the agreement to injure defendants. Defendants allege that plaintiff improperly expanded its discretion to remove defendants' hotel from its national reservation service by misrepresenting the hotel's status to callers. Defendants also allege that plaintiff "manufactured" defendants' failing quality assurance scores in order to terminate the hotel's franchise and the license agreement and collect liquidated damages. If a jury found these allegations to be true, it could also find in defendants' favor on their bad faith and unfair dealing claim. Even in situations where a contract grants a party discretion to act, the implied covenant prevents a party from exercising that discretion unreasonably or outside the contemplated range of the agreement. *See Wilson*, 773 A.2d at 1127.

Plaintiff's motion to dismiss the breach of implied covenant of good faith and fair dealing claim, therefore, will be denied.

### C. Indiana Deceptive Franchise Practices Act Counterclaim

■ Defendants seek, essentially, to pierce their own corporate veil to obtain the protection of the Indiana Deceptive Franchise Practices Act. Defendants claim that defendants Anil and Rakesh Megha, the sole shareholders of Sai Baba, are franchisees under the construction of the license agreement (which names only Sai Baba as the franchisee). To support this assertion, defendants claim that Sai Baba is the "alter ego" of Anil and Rakesh Megha. Therefore, they argue, they are entitled to the protections afforded by the Indiana Act.

Defendants present the unusual spectacle of individuals seeking to pierce their own corporate veil, and thereby disclaim the protections from personal liability provided by and under their corporate structure. One of the major benefits of the corporate structure is that it shields a corporation's shareholders from personal liability for the actions of the corporation. *See* Ohio Rev.Code § 1701.18(I).[3] The "veil" that protects shareholders from liability is pierced only in rare and unique situations to hold shareholders liable for

---

**3.** Because Sai Baba, Inc. is an Ohio corporation, I will look to Ohio law to determine the merits of defendants' "alter ego" claim.

the corporation's acts. The Ohio Supreme Court has held:

> the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere Condominium Unit Owners' Ass'n. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 289, 617 N.E.2d 1075 (1993).

Defendants' "alter ego" claim seems to refer to the first of three situations cited by the Ohio Supreme Court—defendants claim that Anil and Rakesh Megha asserted such complete control over Sai Baba that the corporation had no mind, will, or existence separate from that of its sole shareholders. In support of their argument, defendants state that Anil and Rakesh Megha are the sole shareholders in Sai Baba, costs and expenses "flow through" the corporation directly to Anil and Rakesh Megha, and these two individuals are the sole officers/directors of the corporation.

These factors, however, are not unique to Sai Baba. They are true of many closely-held corporations in which one or two individuals own all shares in the corporation and control the corporation's assets. Were this court to pierce the corporate veil in this case, the protection afforded by incorporation to the shareholders of closely-held corporations would evaporate. Many owners of small businesses, who share with the plaintiffs a conventional close-corporation relationship with their corporate entity, would find themselves ex- posed to personal liability. Defendants have asserted no facts, law, or policies that justify or support such an outcome.

Defendants do not discuss Ohio corporate law in their brief. Instead, they cite a federal case, *Ford Motor Credit Co. v. Garner*, 688 F.Supp. 435 (N.D.Ind.1988), in support of the argument that Anil and Rakesh Megha can be considered "franchisees" for the purposes of applying the Indiana Deceptive Franchise Practices Act to their situation. Although *Garner* cites cases in which courts have found that automobile dealership shareholders, as well as the dealerships themselves, are protected by the Federal Dealers Day in Court Act, the court found that there was not enough evidence to hold that the particular automobile dealer in *Garner* was entitled to such protection under Indiana's law. *See id.* at 444–45. There is no suggestion in *Garner* that such piercing to protect the shareholder should be available in cases not dealing with automobile dealerships.

At any rate, I decline to extend such unusual protection to shareholders who seek unilaterally to cast off the corporate veil in an effort to avoid their the obligations they assumed on behalf of the corporation (i.e., possible liquidated damages for breaching the franchise agreement). The corporation is the franchisee; it, and not its shareholders, is entitled to the protections of the Indiana statute. Plaintiff's motion to dismiss the Indiana Deceptive Franchise Practices Act counterclaim will be granted.

### D. Declaratory Judgment Counterclaim

■ Defendants request "a declaration that the License Agreement is null and void." (Doc. 35, at 20). A claim for declaratory judgment, however, cannot stand on its own, as it does in defendants' counter-complaint.

■ A request for declaratory judgment must accompany the substantive

claim for which declaratory judgment is sought. *See, e.g., Int'l Ass'n of Machinists and Aerospace Workers v. Tennessee Valley Authority,* 108 F.3d 658, 668 (6th Cir. 1997) (" 'a declaratory judgment action is a procedural device used to vindicate substantive rights' ") (quoting *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir. 1992)).

Defendants have failed to state a claim on which relief can be granted by failing to link their request for declaratory judgment to an underlying substantive claim for relief. Plaintiff's motion to dismiss the declaratory judgment counterclaim will, therefore, be granted.

### E. Tortious Interference with Prospective Business Relationships Counterclaim

Analysis of defendants' tortious interference counterclaim depends upon a choice of laws analysis as to which state's law governs this counterclaim. Defendants argue that the claim is governed by Ohio law. Plaintiff assumes that New Jersey law applies.

 The license agreement contains a forum selection clause that states "[t]his Agreement will be governed by and construed under the laws of the State of New Jersey." (Doc. 1 exh. A, at 18). This counterclaim alleges a tort, not a claim based on any provision of the license agreement, and therefore does not fall under the purview of the license agreement's forum selection clause.

 In a tort dispute, the law of the state in which the injury occurred usually controls, unless another state has a more significant relationship with the case. *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984). The factors to be considered in determining whether another state has a more significant relationship include:

(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 ... [of the *Restatement (Second) of Conflict of Laws* ] which the court may deem relevant to the litigation.[4]

*Id.*

 The alleged tortious interference with prospective business relationships in the instant case may have occurred in more than one state. The court does not know, for example, the location of the telephone operator who told callers defendants' hotel was full and directed callers to another Days Inn hotel. Thus, the court does not know where the conduct giving rise to the alleged tort occurred. The place of the injury, however, is clearly Ohio. Defendants' hotel is located in Ohio and the harm they allege resulted from plaintiff's actions occurred in Ohio. Defendant Sai Baba is an Ohio corporation, do-

4. Section 6 provides as follows:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of law to be applied.
*Restatement (Second) of Conflict of Laws* § 6 (1988).

ing business in Ohio in competition with other Ohio corporations.

Although New Jersey is plaintiff's principal place of business, that state does not have a more significant relationship to the tort alleged in the instant case than Ohio. Therefore, I will apply Ohio law for the purposes of analyzing this counterclaim on the motion to dismiss.

■ In Ohio, tortious interference with prospective business relations occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another." *A & B–Abell Elevator Co. v. Columbus/Central Ohio Bldg. and Constr. Trades Council,* 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995). *See also Re/Max Int'l., Inc. v. Smythe, Cramer Co.,* 265 F.Supp.2d 882, 890 (N.D.Ohio 2003) ("Ohio law recognizes both tortious interference with a business relationship and tortious interference with contract rights claims.... The claims differ only in that the former tort does not require proof of a contractual relationship.") (citing *A & B–Abell Elevator Co.,* 73 Ohio St.3d. at 14, 651 N.E.2d 1283).

■ The elements of an Ohio tortious interference with business relationships claim are: "(1) a business relationship ...; (2) the wrongdoer's knowledge of the relationship ...; (3) the wrongdoer's intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages." *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.,* 112 Ohio App.3d 150, 155–56, 678 N.E.2d 248 (1996) (citing *A & B–Abell Elevator Co.,* 73 Ohio St.3d at 14, 651 N.E.2d 1283; *Kenty v. Transamerica Premium Ins.,* 72 Ohio St.3d 415, 650 N.E.2d 863 (1995)).[5]

■ In the instant case, defendants allege that plaintiff prevented defendants from forming business relationships with callers to the national reservation system by misrepresenting the occupancy status of defendants' hotel. If true, this allegation asserts that plaintiff knew of a prospective business relationship (i.e., that callers desired to stay at a hotel in the Van Wert area, where defendants' hotel is located) and acted to prevent that relationship from forming. Defendants allege that plaintiff's action was both intentional and improper.[6] Finally, defendants have al-

---

5. Unlike New Jersey, Ohio does not require proof that the alleged tortfeasor acted with malice. *See Eli Lilly and Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 494–95 (D.N.J.1998) ("To state a claim for tortious interference with business relationships, a plaintiff must allege that: (1) it had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of such relationship or expectancy; (3) the interference and harm inflicted were done intentionally and with 'malice' in the sense of conduct that is wrongful and without justification or excuse; (4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct.").

6. Ohio courts have looked to the *Restatement (Second) of Torts* to determine the meaning of the requirement that the accused party's action be improper.

> The factors to be weighed to determine if an actor's conduct was improper include:
> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

leged damages as a result of plaintiff's alleged actions, and plaintiff has not asserted that its conduct was privileged.

Defendants have, therefore, stated a claim for tortious interference with prospective business relationships, and plaintiff's motion to dismiss this counterclaim will be denied.

## CONCLUSION

In light of the foregoing, it is hereby

ORDERED THAT

1) Plaintiff's motion to dismiss the equitable reformation counterclaim be, and hereby is, granted;

2) Plaintiff's motion to dismiss the implied covenant of good faith and fair dealing counterclaim be, and hereby is, denied;

3) Plaintiff's motion to dismiss the Indiana Deceptive Franchise Practices Act counterclaim be, and hereby is, granted;

4) Plaintiff's motion to dismiss the declaratory judgment counterclaim be, and hereby is, granted; and

5) Plaintiff's motion to dismiss the tortious interference with prospective business relationships counterclaim be, and hereby is, denied.

So ordered.

*Brookeside Ambulance, Inc.,* 112 Ohio App.3d at 156, 678 N.E.2d 248 (quoting *Restatement* *(Second) of Torts* § 767 (1979)).